Mr. Justice NELSON
 

 delivered the opinion of the court:.
 

 As the two stockholders (Rockwell and Fleming), though not made defendants by the bill, were permitted, by leave of the court, to appear and put in answers in the name of the Milwaukie and Minnesota Company, it is material to inquire into the effect to be given to them. That they can
 
 *302
 
 not be regarded as tbe answers of the corporate body is manifest, as a corporation must appear and answer to the bill, not under oath, but under its common seal. And an omission thus to appear and answer according to the rules and. practice'of the court, entitle the complainants to enter'an order that the bill be taken
 
 pro confesso.
 
 A further objection to the practice of permitting a party to appear and answer in the name of the corporation is the inequality that would exist between the parties to the litigation. The corporation not being before the court, it would not be bound by any order or decree rendered against it, nor by any admissions made in the answer or stipulations that might be entered into by the parties or their counsel. It is thus apparent, that while the name of the corporation is thus used as a real party in the litigation so far as the rights and interests of the complainants are concerned, it is an unreal and fictitious party so far as respects any obligation or responsibility-on the part of the respondents.
 

 It is insisted, however, that the directors of this company refused to appear and defend the bill filed against them, and for the fraudulent purpose of sacrificing the interests of the stockholders; and, hence, the necessity, as well as the propriety and justice, of permitting the defence by a stockholder in their name.
 

 Undoubtedly, in the case supposed, it would be a reproach to the law, and especially in a court of equity, if the stockholders were remediless. But in such a case, the court in its discretion will permit a stockholder to become a party defendant, for the purpose of protecting his own interests against unfounded or illegal claims against the company; and he will also be permitted to appear on behalf of other stockholders who may desire to join him in the defence. But this defence is independent of the company and of its directors, and the stockholder becomes a real and substantial party to the extent of his own interests and of those who may join him, and against whom any proceeding, order, or decree of the court in the cause is binding, and may be enforced. It is true, the remedy is an extreme one, and
 
 *303
 
 should be admitted by the court with hesitation and caution; but it grows out of the necessity of the case and for the sake of justice, and may be the only remedy to prevent a flagrant wrong. A complainant, if he chooses, may compel a corporation to appear and answer by a writ of
 
 distringas;
 
 or he may join with the corporation, a director, or officer, if he desires a discovery under oath. But we are not aware of any other except a complainant who can compel an appearance or answer.
 

 Now, although the appearance and answers of the stockholders (Rockwell and Fleming) were irregularly allowed by the court, as each was permitted to appear and answer in the name of the company, yet, as the defence set up is doubtless the same as that which they would have relied on if they had been admitted simply as stockholders, we "are inclined to regard the answers the same as if put in by them in that character, in the further views wo shall take of the case. Each one swore to the truth of his answer in the usual way.
 

 Before we enter upon an examination of the merits of the case, it will be proper to dispose of the cross-bill filed by Fleming against the complainants.
 

 This bill was filed in the name of the company alone, signed by their solicitors and counsel. The name of Fleming does not appear. And in addition to this, it appears that Fleming, in his petition for leave to appear and answer the bill in the name of the company, also asked leave to file, a cross-hill. Leave was granted to put in the answer, but not'to file the bill. The filing of it subsequently, therefore, was an irregularity for which the court below' very properly afterwards set it aside. The cross-bill, so much spoken of n the argument, is thus out of the case. In this connection we may as well refer to the answers of the judgment creditors, who were made parties defendant to the bill of complaint.
 

 Sebre Howard recovered a judgment in the United States District Court, on the 28th November, 1859, against the La
 
 *304
 
 Crosse and Milwaukie Bailroad Company, for the sum of $16,379.86; and Graham & Scott, a judgment in a State court of Wisconsin, on the 25th November, 1858, against the same company for the sum of $29,820.71; and another judgment in the same court, on the 21st September, 1858, for the sum of $11,188.15; and also a judgment against the same company, in the United States District Court, on the 11th January, 1860, for the sum of $44,413.18. This latter judgment appears from the answer, as we undei’stand it, to have been founded on the two previous judgments in the State court. Now, it appears that each of these judgments were recovered after the date of the third mortgage of the La Crosse and Milwaukie Company, upon the foreclosure of which the Milwaukie and Minnesota Company was formed. The liens of these judgments were subsequent to this mortgage, and were cut off by its foreclosure. Indeed, the judgment of Howard, of November, 1858, and the last judgment of Graham & Scott, which was recovered in 1860, never were liens upon, any interest in the road of the La Crosse and Milwaukie Company, the defendants in the judgments, as the equity of redemption had already passed to the purchaser under the sale to Barnes in the foreclosure of the third mortgage, and afterwards became vested in the Milwaukie and Minnesota Company. These judgment creditors, therefore, according to their answers, have no interest in the subject-matter of this litigation. ' We may add, that as replications were filed to the answers, the proof of these judgments should have been produced at the hearing. But the only proof of them that we have found in the record, is in a list of judgments annexed to the report of the master. They were material, and were put in issue by the replication.
 

 These answers of the judgment creditors being thus disposed of, the issues in the case are brought down to those raised by the answers of Bockwell and Fleming, in the name of the Milwaukie and Minnesota Company, which we have agreed to consider rather by indulgence than as matter of strict right, as the answers of the individual stockholders.
 
 *305
 
 And this brings ns to an examination of what may be called the merits of the case.
 

 Before we take up the questions presented by these answers to the bill which bear upon the merits, it will be proper to refer to some matters there presented, and very much discussed on the argument, which, in our judgment, should be laid entirely out of the ease, as tending only to confuse and embarrass the real questions involved. We refer to those parts of the answers which relate to the dealings between the La Crosse and Milwaukie Company'and Chamberlain, in which the complainants in this suit were not concerned, and with which they had no connection, as, for instance, the lease of the road to Chamberlain, and the alle-gation of fraud against him and against the company in conducting the business of running the road under this lease. Also, in respect to other contracts between these parties in relation to the indebtedness of the company to Chamberlain, and to the building and completion of unfinished portions of the road, and equipping it with the rolling stock for -use. These relate to the dealings of the' mortgagor, the La Crosse and Milwaukie Company, with a third person, over which the complainants, as mortgagees,' had no control, and for which they were not responsible. These dealings’were subsequent to the' execution and lien of the mortgage, and could not affect prejudicially the rights' of the mortgagees. They had no interest in the earnings of the road, or concern in the appropriation of them, until the filing of the bill and the appointment of a receiver.
 

 The only matters, therefore, set forth in these answers, and in the proofs, which have any bearing on the merits, are:
 

 1. The allegation that Chamberlain received from the La Crosse and Milwaukie Company two hundred of the bonds secured by this mortgage fraudulently and without consideration.
 

 2. That S. It. Foster received one hundred of the bonds-in the same way.
 

 3. That J. T. Soutter, one of the trustees, received fifty-five of them, and refused to deliver them to the company:..
 

 
 *306
 
 4. That Greáne C. Bronson, the other trustee, received fifteen for the stock of the company.
 

 5. That Prentiss Dow, an officer of the company, received fourteen for less than one thousand dollars.
 

 And 6. That Chamberlain, who had covenanted, in the lease of the road from the company, to apply "the proceeds derived from the use of it to the payment of the interest accruing on the bonds, withheld the payment in pursuance of a fraudulent arrangement with the trustees, or with their agents, for the purpose of bringing about a foreclosure of the mortgage, that he might be enabled to purchase the road.
 

 These are the allegations that bear upon the merits of the .controversy, and deserve to be considered. We shall not, however, encumber this opinion with any very detailed explanation of them, but shall briefly refer to the proofs relating to each of thesje charges.
 

 1. 4s
 
 Chamberlain.
 
 It appears that he held a large claim for damages against the company, on account of their failure to fulfil contracts made with him to build the Western Division of the road. The work on the road was suspended by reason of this failure. And in the "fall of 1857, upon the issue of the bonds of the company, under this second mortgage, an arrangement was entered into by the company, by which he received these two hundred bonds, at fifty cents on the dollar, towards payment of this claim.
 

 2. As
 
 to S.
 
 A.
 
 Foster.
 
 He had loaned the company over one hundred and fifty thousand dollars, and had taken their bonds as security, and, among others, the one hundred in question. It appears that, at a meeting of the Board of Directors, 24th May, 1858, the matter between them was adjusted by delivery of forty land-grant bonds to Foster.
 

 3.
 
 As to T. J. Soutter.
 
 The fifty-five bonds in controversy between him and the company were settled, as appears by a receipt of their chairman and vice-president, on 14th September, 1858, by the delivery of other bonds to the company.
 

 4. As
 
 to G. C. Bronson.
 
 He had purchased fifteen thousand dollars of stock, one hundred and fifty shares, from the company, in the spring of 1857, and paid eighty cents cash on
 
 *307
 
 the dollar, the president at the time agreeing that the company would repurchase it at the same rate, at any time thereafter, if he should wish to surrender it back. The company' was, doubtless, pressed for money at the time. At a meeting of the Board of Directors, on the 2d of September, 1858, it was resolved, that it would take into consideration, the stock theretofore purchased by Judge Bronson, as he rendered many services to the company for which he had received no compensation; and afterwards, in September of. the same year, it appears that the'president of the company, who had induced him to purchase the stock, received it back, and delivered to him the fifteen bonds in question. The truth of the case, therefore, is, that instead of receiving from the company the money he had advanced for the stock, according to their agreement, he received in place of it only bonds of the company of less than half the value; and, as it appears, nothing for his legal advice and services.1
 

 5.
 
 As to Prentiss Doio.
 
 It appears that but thirteen bonds had been received by him, and for which he paid the company, at the time, $11,400 in cash, stock, and other bonds, and was afterwards engaged in its service as agent, settling claims against the company.
 

 In this connection, it is proper to refer to the terms, as published in a circular by the La Crosse and Milwaukie Company, and under which these bonds were negotiated and put into circulation. This paper is dated August 10th, 1857. The company state, that the importance of completing the road this season to the junction of the Western Division (sixty miles from Portage), by which they would hot only control the coming winter’s travel of the Upper Mississippi, but receive over 300,000'aeres of the land grants, have determined the Board of Directors to place before the stock and bondholders extraordinary inducements to furnish the • means; that the sum of $400,000 would be required. To obtain this sum, the company now offers the holders of its' .stock and of unsecured bonds, a new issue of one million of 8 per cent, bonds, &c. The terms proposed are, to receive in payment for a bond of $1000, $400 in cash, and the like
 
 *308
 
 sum in the stock or unsecured bonds of the company. It was upon those terms that the directors went into the market, in the city of New York and elsewhere, for the purpose of negotiating the bonds which now constitute the subject of litigation.
 

 6.
 
 As to the charge of collusion of the complainants with Chamberlain,in the proceedings to foreclose the mortgage.
 
 This allegation is founded upon an agreement entered into with Chamberlain, on the 13th of November, 1859. At the time of this agreement he was in possession of the road, and in the receipt of its earnings, and the obvious object of it, on the part of the trustees, was to procure the control of the net proceeds of its earnings, pending the proceedings of foreclosure. For this purpose, Chamberlain agreed to deposit the whole of the earnings with the agent of the trustees, from day to day; aud the trustees, on their part, agreed to appropriate them to the objects and uses provided for in the lease, as the exigencies and proper working of the road might require. The trustees, in order to secure the fidelity of the officers and agents of Chamberlain, connected with the earnings of the road and the receipt of its revenues, stipulated for a supervision and control -over these persons, and for the discharge of any of them from the service, in case of a dereliction of duty. They provided, also, for access to the books and papers relating to the revenues, management, and running of the road; also, for the appointment of a receiver, in case of the non-fulfilment of the agreement on the part of Chamberlain. These provisions were very important, as the revenues of the road, according to the terms of the lease, after covering running expenses and paying the interest on prior incumbrances, were to be applied to the discharge of the interest on these second mortgage bonds. The interest then due on them amounted to $40,000. It was also agréed that the proceedings of foreclosure should be conducted amicably; that is, no unreasonable opposition should be made to them by Chamberlain. It was further agreed-that the sale should-be made, if practicable, subject to the lease of Chamberlain, and that no
 
 *309
 
 opposition should be made to- his purchase of the road at the sale under the foreclosure; but the trustees expressly reserved the right to bid at the sale for the protection of the bondholders. The trustees also agreed that, in .case Chamberlain should become the purchaser, they would extend a credit of nine and twenty-four months upon so much of the interest as had become due.
 

 It is supposed that the arrangement was entered into for the fraudulent-purpose of enabling Chamberlain to purchase .the road at the foreclosure sale, and thereby cut off subsequent incumbrances-, and especially the rights and interests of the Milwaukie and Minnesota Company, formed under the third mortgage. ■ But there is no evidence of this charge in the proofs, nor even of any previous dealings between the parties, tending to this conclusion. They came-together for the first time after the trustees had determined to foreclose the mortgage for ■ default in the payment of interest, and finding Chamberlain in the possession of the road, and refusing to deliver it over to the trustees, as provided for in the mortgage, but-, on the contrary, -insisting upon his- right to run the same pending the legal proceedings, it is not strange that the trustees should have endeavored to arrange with him for a supervision-and control, in-the meantime, over the earnings and management of the road, and -that he should forbear any unreasonable opposition-to the foreclosure suit. And as to the provision relating to the purchase in case of a sale, there is nothing in it interfering with any rights that belonged to the trustees, or to the prejudice of third parties, the judgment creditors, or company formed under the third mortgage. In a' word, the arrangement was highly beneficial to the bondholders represented by the trustees, and prejudicial to no -one'concerned in the foreclosure suit. -
 

 We shall not, however, dwell longer on this branch of the case; indeed, much that we'have thus far said has been rather by way of explanation, and for the purpose of clearing it of matters and issues that do not belong to- it, and have served only to confuse and embarrass its consideration. In view of this object,and purpose, we have referred to the two
 
 *310
 
 answers of the stockholders, Rockwell and Fleming, and have endeavored to separate the irrelevant matter from that which bore upon the merits, so as to confine the examination to the latter, namely, to the charges against the validity of the bonds impeached, of the number of some three hundred and eighty, in .the hands, or which passed into the hands of several individuals named, and have shown, as we think, by a reference to the proofs, that these charges are not well founded. The general and sweeping allegations against the other portion of the bonds, without specification or identity, we have not specially noticed. These charges are too general to be entitled to consideration, and the proofs relied on are as general and indefinite as the allegations.
 

 We have also shown that the judgment creditors who appeared and answered have no interest in the matters in controversy; and, lastly, that the charges of a fraudulent collusion between the trustees and Chamberlain rest upon suspicion instead of upon proofs.
 

 We now come to a branch of the case which presents a more conclusive-answer to all the charges, whether in allegations or in proofs of the respondents, and overrides all other views that may or can be taken of them.
 

 As we have seen, this third mortgage, under which the Milwaukie aud Minnesota Company was formed, was executed and delivered to Barnes, the trustee, on the 22d Juné, 1858, to secure the payment of an issue of $2,000,000 in ■bonds, and a supplement to this mortgage was executed to thé same trustee, on the 11th August following.
 

 These two mortgages, or rather one in two parts, were, in express
 
 terms,made subject, among other incumbrances mentioned, to the bonds secured by a second mortgage on the Eastern Eivision of the road, to the amount of one million of dollars.
 

 Again, the bonds' issued under this third mortgage, one of which is in the proofs, have an indorsement on the back, as follows: “
 
 State of Wisconsin, La Orosse and Milwaukie Railroad Company, third mortgage sinking fund bond, seven per cent.,
 
 
 *311
 

 ¿•c.;”
 
 subject, among other things,
 
 “to a second mortgage on ■the same line of road of
 
 $1,000,000.”
 

 At the time this third mortgage was executed, and ihus made subject to,the second mortgage bonds, all these bonds had been negotiated by the company, and were in circulation in the business community. They were all negotiated in the months of September, October, November, and December,' 1857. This, the company, of coursej well knew at the time' of the execution of the third mortgage, and knew, also, of the circumstances attending the negotiation of them. They had received and were in the enjoyment of the avails of, them, and with this knowledge, and under these circumstances, the third mortgage, and the bonds issued under it, were made in express terms .subject to the payment and satisfaction of the bonds issued under the second. All persons, therefore, taking these third mortgage bonds, or coming in under the mortgage, took them and came in with a full knowledge that the mortgagor had made the security subject to the prior lien and indebtedness. Even if there had been any valid objection to these bonds under the second mortgage, it was competent for the obligor to waive them, and no better proof could be furnished of the waiver,'than the acknowledgment of the full indebtedness, by making the subsequent security subject to it. This was a question that belonged to the obligor to determine for himself when giving the third mortgage; but, besides this, what right have those coming in under it to complain? They come in with full notice of the acknowledgment of the indebtedness and previous lien; and, especially, what right have the Milwaukie and Minnesota Company to complain, who purchased- the equity of redemption 'through Barnes, their agent, subject to the previous incumbrances of $1,000,000. They have the benefit of that incumbrance by an abatement of that amount in the price of the purchase.
 

 Without pursuing the case further, we are satisfied the decree of the court below, reducing the indebtedness of the La Crosse and Milwaukie Company to the bondholders, is
 
 *312
 
 erroneous, and that the. decision- should have been for the full amount of one million, of dollars, and interest.
 

 “We shall, therefore, reverse the decree, and remit the cause to the Circuit Court of the United States, for the District of Wisconsin, with directions to enter á decree for all the interest due and secured by,the mortgage, with costs; that the court ascertain the amount of moneys in the hands of the receiver or receivers from the earnings of the road covered by the mortgage, which may be applicable to the discharge of the interest, and apply it to the same; and that if the moneys thus applied are not sufficient to discharge the interest due on the first day of March, Í864', then to ascertain the balance remaining due at that date, and in'case such, balance is not paid within one year from the" date of the order of the court ascertaining it, then an order shall be entered directing a.sale of the mortgaged premisses, under the direction of the court, and on bringing the' proceeds into court, they shall be applied' to the payment of the balance of interest; and if-they excéed such balance, shall be applied to the future accruing interest down, to the sale; and if they exceed that, to the principal of the bonds, in case the bondholder’s assent, of.
 
 pro rata
 
 to those who may assent, and any remaining balance of the proceeds .to be invested,'under the direction of the court, for the payment-of future accruing interest,' and ultimately the''principal.
 

 And further, that in case'tiie interest upon the bonds is paid without a sale^the decree shall remain as security for subsequent accruing' interest, and'ultimately for the. principal.
 

 And further, that the court may pay out of -moneys in the hands of the receiver, or out of the .proceeds, the taxed costs of the trustees in the proceedings for the foreclosure of the mortgage, not- taxed and received from the defendants in those proceedings; and also such counsel fees in behalf of the trustees,'as the-court, in its discretion, may seem light to allow. •
 

 Decree accordingly.