[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 327 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 328 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 329 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 330 
Pondir, who claims title to the bills in controversy, under Schepeler Co., alone defends this action. As between him and Schepeler Co., it may be conceded that by the loan of money to the latter firm, under the circumstances established at the trial, and upon their promise to transfer the bills when they should arrive in New York, he acquired an equitable title, and could have enforced a specific performance of the promise, and an indorsement and delivery of the bills to him.
But this equitable right comes far short of conferring upon him the rights of a bona fide holder for value of negotiable paper when transferred in the usual method and in the ordinary course of business. A transferree of commercial paper for value, in the ordinary course of business, without notice of any defects in the title, is protected by the law-merchant against all latent equities, whether of third persons or of parties to the instrument. His title is perfect, and his right to enforce the obligation absolute. But if any of the circumstances are wanting which go to make up this perfect title, a purchaser or transferree of commercial paper takes it subject to the same rules which control in the case of a transfer or assignment of non-negotiable instruments.
The defendant Pondir never became the holder of the bills in dispute; they were not transferred to him by indorsement *Page 333 
in the usual way or in any other manner, and were not at any time in his possession, either actual or constructive; they were never within his control or in the possession or within the control of Schepeler Co., from and under whom he claims title. He only acquired such rights and equities as existed in Schepeler Co., subject to all equities as against them. He occupies precisely the position of that firm; and whatever rights or remedies the plaintiffs or others had against them, in respect to the bills, can be asserted against Pondir as their equitable assignee. (Gilbert v. Sharp, 2 Lansing, 412; Hedges v. Sealy, 9 Barb., 214; Story on Prom. Notes, § 120, note 1; id., § 120, a;Savage v. King, 17 Maine, 301; Calder v. Billington,
15 id., 398; Southard v. Porter, 43 N.H.R., 379.)
Neither was there anything in the history of the transaction or the acts of the parties which will give Pondir a better or other title as against the plaintiff than the mere equitable title, valid as against Schepeler Co. only. The plaintiff is not estopped from asserting the same equities and the same legal rights against Pondir which would have availed against Schepeler Co. The only act of the plaintiff upon which stress is laid and upon which an estoppel is sought to be based, is his dispatch to Schepeler Co.; elliptical and obscure in its terms, but which was understood by the parties to whom it was addressed, and which indicated that the sender had drawn and sold bills on London to the amount of £ 9,000, at the prices stated, and against the bills so drawn would remit, by the steamer Cleopatra, $60,000 in bills on New York, which had been purchased at the discount stated. The telegram was true in all its parts; and the plaintiff does not seek now to controvert the truth of any of the statements there made. There was nothing in it to indicate the relation of the plaintiff or his correspondents, Schepeler Co., to the bills, or the title of either to them. There was no statement inconsistent with the absolute ownership, by the plaintiff, of the bills to arrive by the Cleopatra, or with any claim the plaintiff might make to or in respect *Page 334 
of them as against Schepeler Co., or any other person. The title of the bills was not the subject of or referred to in the dispatch; and if Pondir acted at all on the faith of Schepeler 
Co.'s ownership or right to dispose of the bills, it was upon their statement of such ownership and right, and not upon any statement of the plaintiff; and the case shows, as the court has found, that Pondir did part with his money solely on the credit of Schepeler Co., on the faith of their representations and promise to hand the bills over on their arrival. The only practical use of the telegram was to identify in a manner the bills which Schepeler Co. claimed to own, and promised to transfer. The court below has found that the loan was made by Pondir in good faith; he relying upon the telegram of the plaintiff and the security of the bills in question. He could only rely on the telegram so far as it assumed to state facts; and the only security by means of or upon the bills he acquired was by the written promise of Schepeler Co. to transfer them; and their representations de hors their dispatch.
But an insuperable difficulty in predicating an estoppel inpais against the plaintiff upon the dispatch is, that it was designed solely for the information of the persons to whom it was addressed, and not to influence the action of any other person; and the communication was not of a character calculated to or which could, in the usual course of business, influence the action of third persons; and least of all was it calculated to induce any one to part with money upon the credit of the bills referred to, and faith in the title of Schepeler Co. to them. The plaintiff could not have foreseen that the dispatch would be used as the basis of a credit, or that money could be borrowed on the faith of it. Every element of an estoppel was wanting. A party is only concluded, that is, estopped from alleging the truth by a declaration or representation, inconsistent with the facts asserted and attempted to be proved, when it is made with intent, or is calculated, or may be reasonably expected to influence the conduct of another in a manner in which he will be prejudiced *Page 335 
if the party making the statement is allowed to retract, and when it has influenced and induced action, from which injury and loss will accrue of a retraction as allowed. (Finnegan v.Carraher, 47 N.Y., 493; Dezell v. Odell, 3 Hill, 215;Copeland v. Copeland, 28 Maine, 525; Brown v. Bowen,30 N Y, 519; Frost v. Saratoga Mutual Ins. Co., 5 Den., 154, and cases cited by BRONSON, J.; Brown v. Wheeler,17 Conn., 345; Continental Nat. Bank v. Nat. Bank of Commonwealth,50 N Y, 575.) There is no statement in the cable dispatch which is inconsistent with the rights now asserted by the plaintiff; and the assertion of such rights is not against good conscience in any view of the dispatch or the use designed or expected to be made of it, or which was actually made of it. The plaintiff is not therefore estopped from asserting any right he may have to the bills in controversy.
Neither does the rule invoked by Pondir, that when one of two innocent persons must suffer from the wrongful or fraudulent act of another, the loss should devolve upon him by whose act or omission the wrong-doer has been enabled to perpetrate the fraud, avail him. That applies only when the wrong-doer is invested by the party sought to be charged, with the ordinary indicia of ownership, and jus disponendi of property, or an apparent authority to do the act from which loss must accrue to one of two innocent parties. (Commercial Bank of Buffalo v. Kortright,
22 Wend., 348; Young v. Grote, 4 Bing., 253.) The evidence of ownership of negotiable bills is their possession, properly indorsed, so as to pass the title to the holder. There is no such thing as a symbolical delivery of negotiable instruments; and the law does not recognize, for commercial purposes, a right of possession as distinct from the actual possession. Had Schepeler Co. had actual possession, themselves, of the bills, and then indorsed and transferred them to Pondir, the plaintiff would have been remediless. This is not only the legal evidence of ownership, but it is that required in dealing in commercial paper in the ordinary *Page 336 
course of business; and he who acts with less evidence of title in one claiming to have the right of disposal, does so at his peril. As owners, Schepeler Co. had no apparent title upon which the plaintiff could or did rely.
Neither can an authority be spelled out or inferred from the dispatch to Schepeler Co. to deal with the bills, either as their own or as the agents of the plaintiff or other owner. The apparent authority which will charge the plaintiff rather than the defendant with loss, under the rule invoked against him, must be found in the terms of the dispatch and not in the declarations and representations of Schepeler Co. The court has found that the dispatch gave to Schepeler Co.; and it could give no other or different idea to any other person, the information that he had drawn on London, and sold the bills, "and against the bills so drawn would remit, by the steamer Cleopatra, $60,000 on bills drawn on New York." For what purpose or for whose use the bills on New York were to be remitted, was not stated and cannot be implied, except that they were remitted against the London bills. The meaning and purpose of the dispatch, beyond the meager and barren advice of a proposed remittance for some purpose, must be gathered from the course of business of the parties, or from facts not stated in or to be implied from its terms. But, as remarked in considering the question of estoppel, the communication was legitimate, and in the ordinary course of business not calculated to mislead any one as to the relation of the parties to each other or the bills in controversy; and certainly no person, familiar with commercial usage and the law relating to bills of exchange, could anticipate that such a dispatch could avail to enable any one to negotiate the bills as owner, or otherwise, before their arrival, or that money would be advanced upon any supposed title or agency of the receiver of the dispatch to, or in respect to, the bills.
The only remaining inquiry is, as to the right of the plaintiff as against Schepeler Co., as Pondir occupies precisely their position, and has succeeded to their rights. *Page 337 
The doctrine of stoppage in transitu was largely discussed at the bar in the argument of the case.
It has no direct application; and as the transaction is in its nature entirely distinguishable from the sale of goods upon credit to one who becomes insolvent before they come to his actual possession, or other persons have acquired rights as purchasers for value, and the rules which control in respect to the evidence of title and the modes of transmitting or transferring the title of negotiable instruments, and merchandise or other personal chattels are so entirely dissimilar, that but little advance will be made in arriving at a correct result in this case by reviewing the reported decisions referred to by counsel, elucidating the right and declaring its limits and the cases in which it may be exercised. This is not a case of stoppage in transitu. But the principle which lies at the foundation of the right of stoppage in transitu is very directly involved in this action, and upon it the rights of the plaintiff to the bills in controversy, in a great measure, depend. The right of a vendor to follow and reclaim merchandise sold upon credit, upon the happening of the insolvency of the purchaser, is an equitable right and is favored in the law. (Harris v. Pratt, 17 N.Y., 249; Smith v. Bowles, 2 Esp. R., 578.) It had its origin in a court of equity, but has become thoroughly engrafted upon the common law, and is now well established as a legal right; and the same reasons which give to a seller of goods to a distant purchaser, who becomes insolvent, the right to stop them if he can do so before they come into the possession of the purchaser, will give to the plaintiff here the right to retain the bills in suit. Difficulties exist in the way of the seller of merchandise pursuing and retaking his goods, after sale, by which the title had passed to the buyer, which do not exist in respect to these bills; and this right to stop goodsin transitu may be lost under circumstances which would not and could not, in the nature of things, apply to dealings in or in respect to commercial paper.
The equities upon which the right of stoppage in transitu *Page 338 
rests are stated in Wiseman v. Vandeputt (2 Vern., 203). The plaintiffs, as assignees in bankruptcy of Bonnells, merchants in London, brought their bill for a discovery and relief touching certain silks consigned to the Bonnells by an Italian firm; but before the ship sailed from Leghorn, news came that the Bonnells had failed, and thereupon the Italians altered the consignment, and consigned the silks to the defendants. The court ordered a trial at law in an action of trover, to determine whether by the first consignment the property of the silks vested in the Bonnells, and upon the trial the plaintiffs had a verdict. Upon the cause coming on to be heard upon the equity reserved, the court declared that the plaintiffs ought not to have had so much as a discovery, much less any relief, in regard that the silks were the proper goods of the Italians, and not of the Bonnells, nor the produce of their effects; and therefore, they having paid no money for the goods, if the Italians could, by any means, get their goods again into their hands, or prevent their coming into the hands of the bankrupts, it was but lawful for them so to do, and very allowable in equity. The precise equity of the Italians and their English consignees, the defendants in that case, grew out of and rested upon the fact that, in the course of commercial dealings, the Italians had given credit to the Bonnells, relying upon their solvency and their ability to meet their obligations, and that firm having failed, the consideration which induced the Italians to engage in the transaction and part with their goods had failed, and unless they could repudiate the consignment, and retake their goods, they would be the losers, and that equity did not require that the transaction should be consummated, and the goods of the Italians go to swell the assets of the bankrupts, or go to some favored creditor, and they left to come in as creditors under the statute of bankrupts.
The fact that the credit and the danger of loss arose from a sale of merchandise, rather than in any other commercial dealings, had no peculiar force, and added no charm to the equity. All that is necessary to bring a case within the precise *Page 339 
principle, and the reasons assigned in that case, and which have never been repudiated, but have come to be favored both at law and in equity, is that faith and credit shall have been given to the solvency of another who has failed, while yet the fruits of that credit are in the actual or constructive possession, or within the reach of the party giving the credit, and who will be the loser unless he can retain or reclaim such fruits; and the particular relation of the parties to each other, or the nature of the transaction in which credit is given, is not material, neither is the right confined to goods or personal chattels, or to a sale of goods on credit. There is no distinction between personal chattels in transitu, or merchandise or money, or negotiable bills, which affects the rights of parties. (Smith
v. Bowles, 2 Esp., 578.)
It may be remarked that fraud is not a necessary ingredient of the equitable right involved in this action, and asserted by the plaintiff. Had the court below found as a fact that Schepeler 
Co. fraudulently induced the plaintiff to engage in this transaction, we should have regarded it as abundantly sustained by the evidence. Indeed, it is difficult to see how they could, with honest intent, upon the eve and within three days of an avowed insolvency, so complete and absolute that it is doubtful whether their assets will pay ten per cent of their liabilities, induce an innocent foreign correspondent to assume liabilities for them to an amount exceeding $100,000, under the circumstances and in the form detailed in the case; but it is not necessary to establish actual fraud to enable the plaintiff to assert his right to retain the bills. The plaintiff became the purchaser of the bills in controversy and undertook to remit them to Schepeler Co. upon the credit of that firm, and relying upon their solvency and ability to provide for their payment in London, and to indemnify him against them. They were not bought with the funds and were not the produce of the effects of Schepeler Co., or bought upon their credit, except as the plaintiff gave them credit. They were bought with the *Page 340 
avails of the credit of the plaintiff, and his credit only. The bills on London, from the sale of which the funds were obtained for the purchase of these bills, were drawn by the plaintiff, who was the only person liable upon them. It is true they were drawn by direction of and against the account of Schepeler Co. with the London bankers, but they were not accepted, and upon the non-acceptance the plaintiff was the only party liable to the holders upon the bills, and against this liability he only had the undertaking express or implied of Schepeler Co. In truth, Schepeler Co. had no credit with the London bankers, the drawees, but their account was largely overdrawn. Before the bills could be accepted, and probably before they left Havana, news was received of the failure of Schepeler Co., upon whose credit and solvency the plaintiff had relied in drawing and selling the bills. In brief, the plaintiff had, before receiving intelligence of the insolvency of Schepeler Co., by the negotiation and sale of bills drawn by himself, and upon which he alone was responsible, obtained the money with which the bills in controversy were purchased. It was in one sense a borrowing of money by the plaintiff upon his credit for the use of Schepeler 
Co. If while the money, the proceeds of the sale of the London bills, had been in the actual possession of the plaintiff, he had learned of the insolvency of Schepeler Co., the latter could not either in law or equity have compelled him to pay it over to them or their assignee in bankruptcy, or any favored creditor. He could have retained it to indemnify himself against the liability incurred. An agent may have a lien on the property or funds of his principal for moneys advanced or liabilities incurred in his behalf; and if moneys have been advanced or liabilities incurrred upon the faith of the solvency of the principal, and he becomes insolvent while the proceeds and fruit of such advances or liability are in the possession of the agent, or within his reach, and before they have come to the actual possession of the principal, within every principle of equity the agent has a lien *Page 341 
upon the same for his protection and indemnity. If necessary to his protection, the plaintiff would have been permitted to repudiate the agency and assume that position which would best protect himself from loss by reason of the insolvency of his principal. An action by Schepeler Co. for money had and received to their use, and which ex æquo et bono belonged to them, would have met with no favor. The case is not changed or the rights of the parties varied by a conversion of the money into negotiable paper. The rights and equities of the parties continue so long as the money can be traced and identified, until there has been a change in the possession and title. Had the plaintiff purchased bills payable or indorsed to Schepeler Co., and had them upon his desk ready for transmission at the time of the receipt of news of the insolvency of that firm, no action could have been sustained by them for recovery of the bills in their possession without indemnity to the plaintiff.
Whether the proceeds of the London bills were invested in negotiable bills or merchandise cannot affect the rights of the plaintiff. The lien would be as sound and stand upon the same principle in the one case as the other. If the purchase had been of goods instead of bills, a lien would have existed in favor of the plaintiff, which would have given him the rights of a vendor, within the principle decided in Feise v. Wray (3 East., 93). The substance, rather than the form of a transaction, determines the rights and obligations of the parties, and, within the reason of the rule giving a vendor a lien for the price of goods sold, and a right to stop them in transitu to the purchaser on the happening of his insolvency, he, upon whose credit or with whose means the goods are purchased and by whom they are consigned to the purchasers, is the seller of the goods. The lien does not depend upon the character of the property, and is equally valid in respect to negotiable bills in actual possession, or capable of being reached as to chattels. The bills in controversy were at all times, up to the time of the commencement of this action, in the actual or constructive possession of the plaintiffs. The *Page 342 
purser of the steamer to whom he delivered the package in which they were inclosed was the agent of the plaintiff. He received the package from the plaintiff with special directions to deposit the same in the Post-office in New York city, and those directions were revocable by the plaintiff at any time. He could have recalled the package before the steamer sailed, and could he have overtaken the steamer in mid-passage to New York the same right would have continued, and had he met the purser as he stepped on shore on his arrival in New York he would have been subject to the direction of the plaintiff in respect to the package. The bills were not committed to the post addressed to Schepeler Co., neither were they intrusted to a common carrier consigned to that firm, but were placed in the possession of a servant and agent of the plaintiff for a special purpose, and were, for all purposes connected with his lien and right to retain them, as if they had been during all that time locked up in his safe in Havana. The fact that the bills were payable, either in the body or by indorsement, to Smith, a clerk of Schepeler Co., and with intent to transfer the title to them, does not invalidate the lien or affect the equitable rights of the plaintiff. The transfer was incomplete until delivery, and a transaction begun relying upon the solvency of the parties concerned need not necessarily be consummated, if insolvency occurs. The fact might embarrass the plaintiff in enforcing the collection of the bills, but cannot destroy or invalidate his equitable lien.
I am of the opinion that the plaintiff had and has the legal and equitable title to the bills as against Schepeler Co., and Pondir claiming under them, and that the order granting a new trial should be affirmed and judgment absolute for the plaintiff.
All concur.
Order affirmed, and judgment accordingly. *Page 343