MISSISSIPPI VALLEY TRUST CO. et al. v. WASHINGTON NORTHERN R. CO. et al.

(District Court, W. D. Washington, S. D. March 27, 1914.)

No. 9.

1. MORTGAGES (§ 183*)—PRIORITIES—ESTOPPEL.

Where a junior mortgage expressly recognizes the priority of other mortgages and bonds issued and sold thereunder, the junior mortgagee is estopped to deny the priority.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 442–445. 447, 448; Dec. Dig. § 183.*]

2. CORPORATIONS (§ 480*) — MORTGAGES — PAYMENT — MISAPPROPRIATION OF FUNDS.

Where the proceeds of corporate mortgage bonds were misappropriated or wrongfully diverted, a subsequent mortgagee could not rely on the misappropriation or wrongful diversion as a payment, unless the mort-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

gagors had asked that the diversion or misappropriation should be applied as a payment.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 480;* Mortgages, Cent. Dig. § 290.]

3. CORPORATIONS (§ 479*)—MORTGAGES—FAILURE OF CONSIDERATION—MISAPPROPRIATION OF FUNDS.

Where a corporation executed a mortgage to secure its bonds, and received the cash payment for the bonds called for, the mere fact that the proceeds were misappropriated in violation of a collateral agreement did not affect the rights of the bondholders acquiring the bonds in good faith and not acting in a fiduciary relation, and their subsequent misconduct, if any, could only be the subject-matter of an independent cause of action.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1869, 1872–1874; Dec. Dig. § 479.*]

4. CORPORATIONS (§ 480*)—MORTGAGES—LIEN AND PRIORITY—COUNTERCLAIM.

In a suit by prior mortgagees to foreclose, a subsequent mortgagee cannot complain, by way of set-off or counterclaim, for a diversion of the funds acquired through the prior mortgages, though the mortgagors are insolvent.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 480;* Mortgages, Cent. Dig. § 290.]

5. CORPORATIONS (§ 480*)—MORTGAGES—BONDS—PRIORITIES.

Where a railroad company executed a mortgage to secure $1,000,000 of its bonds which were purchased by a timber company, which executed a mortgage to secure $600,000 in bonds, and which deposited with the trustee in the two mortgages $600,000 of the railroad bonds as further security, the provision in the timber company's mortgage that on the payment of any of its bonds a like amount of the railroad bonds transferred to the trust company should be canceled and returned to the railroad company, or delivered to it uncanceled, at the option of the railroad company, did not give to a second mortgagee, obtaining an assignment of the railroad company's bonds to be delivered on their release from the prior mortgage, the right to bonds surrendered from time to time under the terms of the prior mortgage, but the prior creditors were entitled to the security given by the prior mortgage to the full amount until the debt was fully paid.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 480;* Mortgages, Cent. Dig. § 290.]

In Equity. Suit by the Mississippi Valley Trust Company and another against the Washington Northern Railroad Company and others. On motion to strike out allegations of answer of defendant William W. Crawford. Motion granted.

Snow & McCamant, of Portland, Or., and Huffer & Hayden, of Tacoma, Wash., for complainants, rely on the following authorities: Bronson v. La Crosse R. R. Co., 2 Wall. 283, 310, 17 L. Ed. 725; Jerome v. McCarter, 94 U. S. 734, 736, 24 L. Ed. 136; Central Bank v. Hazard (C. C.) 30 Fed. 484, 486; Pratt v. Nixon, 91 Ala. 192, 8 South. 751; Horton v. Davis, 26 N. Y. 495; Freeman v. Auld, 44 N. Y. 50; Johnson v. Thompson, 129 Mass. 398, 400; 34 Cyc. 758; Gillespie v. Torrance, 25 N. Y. 306, 311, 82 Am. Dec. 355; Force v. Age-Herald Co., 136 Ala. 271, 33 South. 866, 868; Allis v. Jones (C. C.) 45 Fed. 148, 150; Old Dominion Co. v. Lewisohn, 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025; Williams Co. v. Kinsey Co. (D. C.) 205 Fed. 375, 376; 34 Cyc. 719, 720; section 3443, Rem. & Bal. Code;

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2 Randolph on Commercial Paper, § 986; New York Security Co. v. Equitable Co. (C. C.) 77 Fed. 64; Dooley v. Virginia Co., 7 Fed. Cas. page 913, No. 3999; In re Burton (D. C.) 29 Fed. 637, 638, 640; White v. Fisher, 62 Ill. 258, 259, 261; Gordon v. Wansey, 21 Cal. 77, 79; Schinkel v. Hanewinkel, 19 La. Ann. 260; Thompson's Adm'r v. George, 86 Ky. 311, 5 S. W. 760; Eastman v. Plumer, 32 N. H. 238; Wallace v. Bank, 1 Ala. 565, 570; Winans v. Wilkie, 41 Mich. 264, 1 N. W. 1049; Brosseau v. Lowry, 209 Ill. 405, 70 N. E. 901, 904; Lawson v. McKenzie, 44 Iowa, 663; Swem v. Newell, 19 Colo. 397, 35 Pac. 734, 735; Kneeland v. Miles (Tex. Civ. App.) 24 S. W. 1113, 1115; First Nat'l Bank v. Maxfield, 83 Me. 576, 22 Atl. 479, 480; First Nat'l Bank v. Harris, 7 Wash. 139, 142–144, 34 Pac. 466; 4 Am. & Eng. Enc. of Law. (2d Ed.) p. 310; 2 Randolph on Commercial Paper, § 289; Storey on Promissory Notes, § 120; Muller v. Pondir, 55 N. Y. 325, 14 Am. Rep. 259; O'Mulcahy v. Holley, 28 Minn. 31, 8 N. W. 906; Central Trust Co. v. First Nat'l Bank, 101 U. S. 68, 25 L. Ed. 876–878; Thompson-Houston Elec. Co. v. Capitol Electric Co. (C. C.) 56 Fed. 849; Spinning v. Sullivan, 48 Mich. 5, 11 N. W. 758; Galusha v. Sherman, 105 Wis. 263, 81 N. W. 495, 47 L. R. A. 417; Osgood's Adm'rs v. Artt (C. C.) 17 Fed. 575.

Kerr & Crawford, of Seattle, Wash., for defendant Crawford, rely upon the following authorities: Section 848, vol. 3, Cook on Corporations; Drury v. Cross, 7 Wall. 299, 19 L. Ed. 40.

CUSHMAN, District Judge. Complainants interpose a motion to strike out certain paragraphs of the amended answer of the defendant William W. Crawford. For a proper understanding of the matter, a brief outline of the complaint and answer is necessary.

Complainants ask the foreclosure of two mortgages, executed January 4, 1910—one upon the property of the Washington Northern Railroad Company, hereinafter referred to as the "railroad company," and the other upon the property of the Oregon-Washington Timber Company—both given to the Mississippi Valley Trust Company, the first of which is now held by it and the second by it and its cotrustee, Union Trust Company, one of the plaintiffs herein.

The railroad company's mortgage was given to secure bonds to the amount of $1,000,000, all of which have been issued. The Oregon-Washington Timber Company's mortgage was given to secure $600,000, in bonds. All of the railroad company's bonds were purchased by the Oregon-Washington Timber Company, and $600,000 worth of these bonds were surrendered to the Mississippi Valley Trust Company, as part of the security for the payment of the $600,000 of the Oregon-Washington Timber Company's bonds. The Oregon-Washington Timber Company's mortgage provides that, upon the payment of any of its bonds, a like amount, par value, of the railroad company's bonds, so conveyed to the trust company, should be also canceled and returned to the railroad company, or delivered to it uncanceled, at the option of the railroad company. The $600,000 of the Oregon-Washington Timber Company's bonds were sold. On the same date (June 4, 1910), the Oregon-Washington Timber Company executed a second

mortgage to the same trustee to secure a bond issue of $400,000, sold by it to the railroad company, and also transferred to the railroad company, to secure the payment of the $400,000, a like amount of the railroad company's bonds, which latter bonds are held by the trustee. The second mortgage, in like manner, provides for the surrender of the railroad company's bonds, upon payment of those of the Oregon-Washington Timber Company.  The railroad company and the two defendant timber companies, on March 1, 1912, gave a further mortgage to the defendant Crawford, as trustee, by which the railroad company assigned to him the said $400,000 second mortgage bonds of the Oregon-Washington Timber Company and the $1,000,000 of the railroad company's bonds, the latter to be delivered upon their release under the prior mortgages.  By an agreement between the railroad company and the Oregon-Washington Timber Company, the proceeds of the second mortgage bonds of the Oregon-Washington Timber Company, secured by the $400,000 of the railroad company's bonds, were to be used in building additional railroad lines, but were pledged to the trustee, Crawford, who, it is charged, had notice of the terms of this agreement.  Thirty thousand dollars, only, of the Oregon-Washington Timber Company's bonds have been paid.  Upon which, $30,000 of the railroad company's bonds were released and delivered to the mortgagee, Crawford, uncanceled.

The complainants ask, upon the decree, a determination whether the $430,000 railroad company's bonds claimed by Crawford are equal in dignity, or postponed to the $570,000, held as security by complainants.

The defendant Crawford, trustee, answers that a proposition made June 4, 1910, by the Oregon-Washington Timber Company was accepted by the railroad company, the material parts of which proposition were:

"We understand that you are proposing to make certain extensions to your railroad (formerly owned by the Cape Horn Railroad Company), the result of which will be to increase our facilities for marketing the timber from our lands, in Skamania county, Washington, and that you have authorized an issue of one million dollars ($1,000,000) par value first mortgage six per cent. gold bonds, dated the 4th day of June, 1910, due on the first day of May, 1928, and secured by a first mortgage on your railroad property.

"We propose to buy from you the entire issue of one million dollars ($1,000,000) par value of said bonds and pay you therefor four hundred thousand dollars ($400,000) par value of our bonds as hereinafter described, and the sum of five hundred and forty thousand dollars in money, said money to be used for the following purposes:

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"$125,000 to be used for the payment of the present floating indebtedness of the Cape Horn Railroad Company.

"$215,000 to be used for extensions, betterments and equipment to your railroad property.

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"As a further consideration for the sale to us of said one million dollars ($1,000,000) of your bonds, and without any new or further consideration, we agree to sell and deliver to you four hundred thousand dollars ($400,000) par value six per cent. gold bonds issued by us, dated the 4th day of June, 1910, due serially $30,000 par value every six months, beginning May 1st, 1922, the last $40,000 thereof maturing May 1st, 1928, and secured by second mortgage on our lands and timber in Skamania county, Washington, and

secured also by $400,000 par value of the $1,000,000 par value of bonds now proposed to be purchased by us from you; said $400,000 par value of our bonds so sold to you; however, or the proceeds of the sale thereof, to be used by you only for future extensions, betterments or equipment to your railroad; after the expenditure of the said sum of $540,000 above mentioned.

"The $1,000,000 par value of your bonds hereby proposed to be purchased by us are all to be executed and delivered by you to the trustee in the mortgage securing the same, and to be by said trustee duly authenticated, and $600,000 par value thereof to be deposited with the Mississippi Valley Trust Company of St. Louis, Missouri, to be by it held in trust as security under the terms of a certain first mortgage dated June 4, 1910, executed by us to said Mississippi Valley Trust Company to secure an issue of $600,000 par value of 6% gold bonds issued by us, and the remaining $400,000 par value of your bonds hereby proposed to be purchased are to be deposited with the said Mississippi Valley Trust Company to be by it held in trust as security under the terms of a certain second mortgage dated June 4th, 1910, executed by us to said trust company to secure an issue of four hundred thousand dollars ($400,000) par value second mortgage 6% gold bonds issued by us, which latter $400,000 par value second mortgage bonds are the bonds hereinabove agreed to be sold and delivered to you.

"The said sum of $540,000 to be deposited as needed for the purposes mentioned above to your credit at said Mississippi Valley Trust Company and to be paid out in checks signed by you and countersigned by said trust company for said purposes."

It is averred: That the $600,000 timber company bonds mentioned were sold to a syndicate, together with $999,300 par value of the corporate stock of the railroad company, for $540,000. That the members of the syndicate and trust company knew, at the time of the purchase, of the purposes to which, by the agreement, the money raised was to be applied. That a large portion of these bonds are still held by the members of this syndicate. That, instead of the money being expended as agreed, the proceeds of the sale of the bonds were spent, in part as follows:

"$175,000 for the payment of timber lands acquired by the Oregon-Washington Timber Company from the Whitney estate. An amount in excess of $100,000, as this defendant believes and charges to be the fact, in building camps and in buying additional logging equipment for the Oregon-Washington Timber Company."

—That the railroad company was without power to issue bonds for such purpose, but this was done by the trust company at the direction of the present holders of the $570,000 bonds upon which suit is brought, $300,000 of which bonds are still held by the members of the syndicate. That complainants are estopped from sharing in the proceeds of the sale of the railroad company's property to the extent of such unauthorized expenditure.

This defendant further avers that in February, 1911, the Blazier Timber Company was incorporated; that subsequently the two timber companies and the railroad company authorized the execution, by the three companies, of two series of notes; Series A to consist of $100,000, joint collateral trust notes, series B, of $150,000, joint collateral notes. These notes were secured by an indenture of the three companies to the Mississippi Valley Trust Company, conveying all of the property of the Blazier Timber Company and the railroad company, and assigned to the trustee the $400,000 second mortgage bonds of the

Oregon-Washington Timber Company and $400,000 of its own bonds, deposited as collateral security for those of the timber company.

The proceeds of the series A notes were used as authorized; but it is alleged that the series B notes were delivered to the syndicate for the purchase of the railroad company's stock, sold to the syndicate with the first mortgage bonds of the Oregon-Washington Timber Company; that the stock was not sold to either of the three companies, but to J. E. Blazier, individually; that the amount of these notes has been paid to the members of such syndicate by the railroad company and the Blazier Timber Company, for which purpose the funds of such companies have been unlawfully diverted. These transactions are alleged as an offset herein. To have an accounting of such funds, defendant asks that the members of the syndicate be brought into the suit, or, if beyond the jurisdiction, that they be denied the right to participate in the proceeds of the sale upon foreclosure herein.

The motion to strike is directed to the foregoing allegations of the answer.

[1] The mortgage to the defendant Crawford expressly recognizes the priority of the mortgages being foreclosed herein and the $600,000 of bonds issued thereunder. As a subsequent mortgagee, the defendant Crawford is estopped to deny such priority.

"At the time this third mortgage was executed, and thus made subject to the second mortgage bonds, all these bonds had been negotiated by the company, and were in circulation, in the business community. They were all negotiated in the months of September, October, November, and December, 1857. This the company, of course, well knew at the time of the execution of the third mortgage, and knew, also, of the circumstances attending the negotiation of them. They had received and were in the enjoyment of the avails of them, and with this knowledge, and under these circumstances, the third mortgage, and the bonds issued under it, were made in express terms subject to the payment and satisfaction of the bonds issued under the second. All persons, therefore, taking these third mortgage bonds, or coming in under the mortgage, took them and came in with a full knowledge that the mortgagor had made the security subject to the prior lien and indebtedness. Even if there had been any valid objection to these bonds under the second mortgage, it was competent for the obligor to waive them, and no better proof could be furnished of the waiver than the acknowledgment of the full indebtedness, by making the subsequent security subject to it. This was a question that belonged to the obligor to determine for himself when giving the third mortgage; but, besides this, what right have those coming in under it to complain? They come in with full notice of the acknowledgment of the indebtedness and previous lien; and, especially, what right have the Milwaukie and Minnesota Company to complain, who purchased the equity of redemption through Barnes, their agent, subject to the previous incumbrances of $1,000,000. They have the benefit of that incumbrance by an abatement of that amount in the price of the purchase." Bronson v. La Crosse Railroad Co., 2 Wall. 283, at page 311 (17 L. Ed. 725); Jerome v. McCarter, 94 U. S. 734, 24 L. Ed. 136.

[2] Clearly the matters set up do not amount to payment of the bonds. To constitute payment something of agreement, or consent, actual or constructive, as to the application of credits, either on behalf of the trust company, or the bondholders, or the mortgagor would be necessary. Consent of the mortgagor might take the form of asking the application of payment of the funds theretofore wrongfully diverted

or misappropriated, but where one claims through the debtor, such consent in some form is. essential.

[3] The diversion of the funds from their authorized purpose is not a failure of consideration. The $540,000 agreed to be paid for the bonds was the consideration therefor. It was paid and received by the mortgagor, and, if the agreement collateral to the mortgage between the railroad company and the Oregon-Washington Timber Company, as to its expenditure, was violated and more money expended for the benefit of the timber company than agreed, it cannot be said to be a failure of consideration for the bonds or mortgage securing them. When the money was paid for the bonds, the bondholders were not thereafter concerned or responsible for its disposition. If·they were subsequently guilty of misconduct—having acquired the bonds in good faith—and not acting in a fiduciary relation thereto, it would not avoid the bonds, but be the subject-matter of an independent cause of action.

[4] Considering the matters set up in the answer as in the nature of a set-off or counterclaim, and putting to one side the question whether they are of such a nature as to warrant their pleading by the proper party, under Equity Rule 30 (198 Fed. xxvi, 115 C. C. A. xxvi), yet it is clear that they are causes of complaint which concern the railroad company in the one instance, and the railroad company and the Blazier Timber Company in the second instance, and that Crawford, as a subsequent mortgagee, does not control them; that they are not asserted by the holder of the right of action thereunder, if any.

"Mutual cross-demands do not, as a general rule, extinguish each other by the mere operation of the law regulating set-offs, without the acts of the parties, and a defendant holding a claim against plaintiff is not compellèd to avail himself of it, but has the option of pleading the same by way of set-off in an action against him, or of making it the ground of an independent action, and the rule is the same in regard to recoupment and counterclaim; and plaintiff has no option or power to require him to do so, or to apply the subject of the set-off as a payment on his demand, in the absence of any agreement authorizing such application." 34 Cyc. 758.

The allegations that the debtor companies are insolvent are not sufficient to warrant the court in giving to a particular creditor, where there may be many interests affected, the right to speak and make election for the alleged insolvents.

[5] The defendant urges that his defense is not controlled by the foregoing reasons, because of the fact that, while his mortgage, executed by the three defendant companies, expressly recognized the priority of the mortgages herein sought to be foreclosed and the bond issues thereunder, yet, as part of his security, there were assigned to him the railroad company bonds held by complainants, to be delivered to him as they were, from time to time, surrendered, under the terms of the first mortgage; that therefore defendant, as a holder of bonds secured by the first mortgage of the railroad company, is not estopped to question the amounts due other bondholders of the same issue. This position is untenable. Defendant cannot now be considered as the innocent holder of negotiable paper before maturity, for he did not come into possession of the bonds at the time he parted with his money. He has

not possession now of the bonds. They are in the possession of complainants to secure another's claim. But $30,000 of them have been released. Defendant can have no right to them until they are released. 2 American & English Encyc. of Law (2d Ed.) 310; 7 Cyc. 926; Muller v. Pondir, 55 N. Y. 325, 335, 14 Am. Rep. 259. To accomplish their surrender may take the entire property securing them, and, so far as the first bond issue is concerned, he gets them, if at all, after they have matured and, in effect, been paid.

It is not necessary to consider whether, under the circumstances of this case, the railroad company's bonds are held as collateral security, or otherwise. The effect upon this defense is the same. The recognition by an unsecured creditor of the right of the debtor, upon payment, to obtain, uncanceled, the written evidence of the debt would justify the conclusion that such unsecured creditor contemplated the effective reissue of such obligation. But that is not this case.

The railroad company was interested in having its bonds surrendered to it, and not surrendered to the timber company, the party pledging the railroad company's bonds, and, ordinarily entitled, upon the payment of its debt, to a surrender of the collateral securing it. By the surrender of its bonds to the railroad company, the size of its debt was lessened. To say it might, at its option, receive these bonds uncanceled would get around, so far as the parties to the agreement are concerned, the reasoning embodied in that line of decisions holding that their surrender would absolutely extinguish them for all purposes, as evidences of existing obligations. In re Burton (D. C.) 29 Fed. 637. But, in the absence of a more clearly expressed intention than appears in the first mortgages, it could not fairly be assumed that it was intended that the surrendered bonds, if reissued, should assume even rank with those not surrendered. The prior creditor is entitled to its security to the full from both mortgagors, and this right is undiminished until its debt is fully paid. N. Y. Security & T. Co. v. Equitable Mortgage Co. (C. C.) 77 Fed. 64.

If the money paying the timber company's bonds was realized from the property of the railroad company, and a railroad company bond was surrendered and reissued of equal rank with those unsurrendered, the security for the remaining bonds would be lessened and diluted. Such a proceeding would effect a partial release of the mortgage. By surrendering, or agreeing to surrender, to the obligor uncanceled bonds discharged from the mortgage securing them, no right under the mortgage is assigned or given. By that transaction, they are severed and separated from the mortgage, originally securing them, and, unless some innocent purchaser, ignorant of their reissue, held them for value, they could not again be held to share under the lien of the mortgage.

Whether such circumstances would affect such reinstatement of such bonds under the mortgage, it is not now necessary to determine; but, if such was the result, it would primarily depend upon equitable principles not here present. Under the circumstances of this case, to warrant such an effect, the language should be clear and positive.

Whatever the effect of the reissue of these bonds to Crawford, on

debts, contracted subsequent to the first mortgage and prior to their delivery, may be, every reason is against their being held of equal rank with unpaid and unsurrendered bonds of the same issue.

All of the matters moved against will be stricken.