[*In re* Tallassee Manufacturing Co.]

# Lehman Brothers *v.* Tallassee Manufacturing Company; Clopton *et al. v.* Same; Stone & Clopton *v.* Same.

| 64 | 567 |
|----|-----|
| 96 | 251 |
| 64 | 567 |
| 100 | 230 |
| 64 | 567 |
| 107 | 639 |
| 108 | 87 |
| 108 | 293 |
| 64 | 567 |
| 115 | 617 |
| 115 | 632 |

1. *Bonds of private corporation; transfer as collateral security.*—A private corporation, created for commercial purposes, has implied power to deal on credit, for any proper corporate purpose, in the usual and ordinary mode of conducting its business, under the circumstances in which it may be placed ; and being expressly authorized, by special statute, to issue bonds, and to secure their payment by mortgage of its property, a resolution of the stockholders, at a meeting called to consider the issue of such bonds, authorizing them to be used in payment, at par value, of any indebtedness of the company, or to raise money to conduct its business, does not limit or restrain the power to transfer them as collateral security for an existing debt.

2. *Same; rights of holder as collateral security.*—The holder of such bond, transferred to him as collateral security, is entitled to share in the benefits of a mortgage executed to secure payment of the bonds, if he acquired it in good faith ; that is, there must have been good faith in the particular transaction by which he acquired the bond ; but the inquiry will not be extended to former separate and distinct transactions between him and the officers of the corporation, in which his debt originated.

3. *Same; negotiability of.*—The act approved December 15, 1870, authorizing the Tallassee Manufacturing Company Number One, on a vote of two-thirds of its shareholders in value, to issue its bonds for a sum not exceeding one-third of its capital stock paid in, in bonds of $1,000 each, payable in gold, with legal interest, and coupons for interest attached, payable in gold, semi-annually, at such place as it may appoint (Sess. Acts 1870–71, p. 240), "contemplates the issue of instruments having all the qualities, elements, and characteristics of negotiable paper, which could be introduced into the commercial markets, circulating and passing as such paper in the usual course of business ;" and the bonds issued under the authority of this statute, being payable to bearer, at the office of the company in Montgomery, with coupons for interest attached, payable semi-annually at a designated bank in New York, are negotiable instruments.

4. *Negotiable paper; rights of holder.*—Whoever is found in possession of negotiable paper, before maturity, is presumed to hold for value, and in good faith ; and this presumption can only be repelled by clear and distinct allegations and proof of a want of consideration, or a want of good faith in its acquisition.

5. *Same; who is holder in good faith.*—The negotiable bonds of the corporation in this case having been issued by authority, their transfer as collateral security for existing debts also being authorized, and some of them having been thus transferred to a commercial partnership, with whom the corporation had extensive dealings for a series of years, and who were stockholders in the corporation ; the rights of said partnership, as a holder in good faith, are not affected by the fact that their debt against the corporation was not communicated to the other stockholders, and was not known to them ; nor by the fact that the indebtedness did not appear by the books of the corporation, to which the stockholders had access ; nor by the further fact that said partnership, as stockholders, received dividends while the debt to them was being contracted. These facts have in them no element of estoppel, and are not sufficient to overcome the presumption, arising from possession before maturity, that they were acquired in good faith.

[*In re* Tallassee Manufacturing Co.]

6. *Banker's lien.*—A bank or banker has a lien on all moneys and securities of a customer, coming into his possession in the regular course of business, for any balance due him on general account.

7. *Rents and profits of mortgaged property.*—So long as a mortgagor remains in possession, the rents and profits of right belong to him, and he may receive and apply them to his own use ; and if he makes default in the payment of the secured debt, and becomes insolvent, the mortgagee may have a receiver appointed, pending a suit for foreclosure, and thus intercept the rents and profits, when the property itself is not adequate security, or when there is imminent danger of waste or destruction.

8. *Apportionment of profits earned by receivers.*—Where a manufacturing company executed a mortgage or deed of trust on its factory and franchises, for the security of certain bondholders, and afterwards, becoming insolvent, executed an assignment of all its property, for the benefit of all its creditors generally ; and the trustees then filed a bill for the foreclosure of the mortgage or deed of trust, making the assignees parties, and alleging that it would be for the interest of all the parties concerned that the factory should be operated in accordance with the provisions of the assignment, subject to modification by the court from time to time ; and the assignees then filed a bill for the settlement of the assignment, marshalling the assets, etc.; and receivers were appointed, who operated the factory for a number of years, under the general orders of the court, without objection from any of the parties or creditors ; *held,* that the net profits realized by the receivers should be apportioned between the mortgagees (or bondholders) and the general creditors—the former being entitled to the portion realized from the use of the mortgaged property, and the latter to the residue arising from the use of the property not covered by the mortgage.

9. *General assignment for benefit of creditors ; declared preferences, and how avoided.*—An assignment of all his property by a debtor, for the benefit of one or more creditors, enures to the equal benefit of all his creditors ((Code, § 2126), notwithstanding any preferences it may declare ; and though it is valid and operative according to its terms, as against the assignor and the trustee, and only the creditors postponed or injured by it can complain of the preferences declared ; yet the manner in which they may make complaint, and the court can entertain their complaint, depends upon the nature and character of the proceeding in which the conflicting rights of the respective creditors may be involved.

10. *Same; interlocutory order for payment of preferred creditor.*—An interlocutory order, in a suit instituted by the trustees for the settlement of the assignment, directing the receivers, who were operating the property (a large factory) under the orders of the court, to pay a preferred creditor, for money loaned, "whenever, in their good judgment, such payment may be made without embarrassing the operations of the company," being conditional, and the condition not having happened, is without effect on the final hearing ; and having been made before the creditors, who were affected by it, had been brought before the court, it could not embarrass the court in the final distribution of the assets.

11. *Same; when cross-bill is necessary.*—The rules of practice as to the filing of cross-bills "have but a narrow and limited application to suits for the marshalling and distribution of assets, when creditors having conflicting claims are not introduced as formal parties, but come in under the decree of the court, and submit to its jurisdiction, that their rights in the administration of the assets may be protected and enforced," In such cases, "the court must mould and adapt its practice and course of proceeding to the rights and equities of the parties ;" and where the assets to be distributed are the proceeds of sale of the property of an insolvent corporation, conveyed by general assignment for the benefit of creditors, and sold under the order of the court in a suit instituted by the trustees, the creditors having come in and proved their claims, no cross-bill is necessary to enable the court to distribute the money among all the creditors, disregarding the preferences declared by the assignment.

12. *Same; assent of creditors.*—A recital in a general assignment for the

[*In re* Tallassee Manufacturing Co.]

benefit of creditors, declaring preferences, that "the creditors have assented to the terms herein stated," is the mere declaration of the grantor, and does not conclude any creditor who is not otherwise shown to have assented to it.

13. *Attorney's lien.*—Under a bill for the settlement of an assignment executed by an insolvent corporation, and the distribution of the assets among creditors, attorneys who represented the corporation, and resisted the claims of creditors, can not claim any lien on the fund in court, and the court can not give them a preference over other general creditors.

APPEALS from the Chancery Court at Montgomery.

Heard before the Hon. H. AUSTILL.

In the matter of the settlement of the affairs, and the marshalling and distribution of the assets, of the Tallassee Manufacturing Company Number One, an insolvent corporation, under a bill filed by Charles T. Pollard and George Goldthwaite, as trustees in a deed of trust, or mortgage, executed by the said corporation; separate appeals being sued out by Lehman Brothers, a mercantile partnership doing business as commission-merchants and bankers in the city of New York; by David Clopton, Charles J. Matthews, and George Goldthwaite, directors in said corporation, claiming a preference and priority as creditors, under the facts hereinafter stated; and by Stone & Clopton, attorneys at law, claiming an allowance for professional services rendered during the suit.

The said corporation was created by an act of the General Assembly of the State of Alabama, approved May 29th, 1852, which may be found in the Session Acts of 1851–2, pp. 262–64. The charter does not show the purposes for which the corporation was created, or the business which it was to carry on, except as may be inferred from its name. The corporation was duly organized, in accordance with the provisions of its charter, its factory being located at Tallassee, then in Tallapoosa, now in Elmore county. On the 15th December, 1870, a special statute was enacted by the General Assembly, entitled "An act to authorize the Tallassee Manufacturing Company Number One (1) to issue bonds, and secure the payment thereof by mortgage, or deed of trust," which was as follows: "SECTION 1. *Be it enacted,*" &c., "that the Tallassee Manufacturing Company Number One (1) is hereby authorized, by a vote of two-thirds of the stockholders in value, to issue its bonds for a sum not exceeding one-third of the capital stock of said company paid in, in bonds of one thousand dollars each, payable in gold, with interest at eight per-cent. *per annum;* coupons for the interest to be attached, payable semi-annually, at such place as it may appoint, also payable in gold." SEC. 2. "*Be it further enacted,* that such bonds shall not have longer time to run than ten years from the date thereof; and the said company is also authorized to

secure the payment of said bonds by a mortgage, or deed of trust, of the property and franchises of said company."—Session Acts 1870–71, p. 240.

A few days after the passage of this act, a meeting of the stockholders of the company was held, under the call of B. H. Micou, the president, at which the following proceedings were had, as shown by the record or minutes of its proceedings: "December 30, 1870. In compliance with a call from the president, a meeting of the stockholders in the company was this day held in the city of Montgomery, at which meeting were present B. H. Micou, T. M. Barnett, N. D. Barnett, B. D. Fry, Charles Matthews, and J. W. Durr; and the following stockholders were represented by their proxies; J. R. Brown, G. W. Stone, Julia Ardis, Lehman Brothers, and Lehman, Newgass & Co.; the whole number of shares represented being 5388." The meeting being organized, "the president then read the following report, which was received, and ordered to be recorded." The report, as set out, is dated the 28th December, 1870, addressed to the stockholders, and in these words: "Gentlemen—I have called you together, to ask your assistance to put the financial matters of the company on a solid basis. The plan I propose is this: to issue bonds for $200,000, and provide for the payment of the same by a deed of trust on the property and franchises of the company. The necessity for permanent relief by addition of cash capital has existed for months past, and I have been harassed almost past endurance to make money arrangements to meet our engagements. . . . Hence, I call you together again, to ask that you authorize me to issue bonds to the amount stated, to enable me to raise the capital to conduct our business. My plan is to prepare these bonds with great care, so as to make them a first-class security; to keep the ownership of the bonds in the company, but to use such portion as collateral security to raise money to conduct business, and to finally dispose of the bonds permanently in the shape of dividends to the stockholders, as dividends are earned; and thus, in the course of two years, supply ourselves with a permanent capital to transact our business, and placing our debt in the hands of the shareholders themselves. I propose, when our accounts are made up for the present year, if it appears there has been a profit on that portion of the machinery which has been at work, to divide the profit, whatever it is, among the shareholders, in the shape of these bonds; and so, on the 1st of July and 1st of January of each year, until all are permanently disposed of. Then, it will become necessary to provide a sinking fund, for the final payment of the bonds. This plan is proposed after most

[*In re* Tallassee Manufacturing Co.]

careful and mature deliberation, and I believe it offers the easiest and most certain remedy for the difficulties under which we now labor. In order to enable us to issue such bonds having full authority, I applied to the legislature to pass a law authorizing us to issue bonds to amount of one-third paid up capital, on vote of two-thirds shares. I expect, in a few weeks, to make a full and careful report of the condition of the company," &c.

The next entry on the record of the proceedings of the meeting, immediately following the foregoing report, is in these words : ' " By a vote of 5388 shares, being all the shares represented, the meeting then adopted the following resolutions : *Resolved*, that in accordance with power granted by the legislature of the State of Alabama, the president of this company is authorized to issue two hundred (200) bonds, of one thousand dollars ($1,000) each, payable ten years after date, principal and interest payable in gold ; each bond to be signed by the president and secretary of the company ; and to secure the payment of the same, the president is hereby authorized to execute a deed of trust, conveying to Charles T. Pollard and George Goldthwaite, as trustees, all the real estate, buildings, machinery, and franchises of the company ; the said trustees to signify their acceptance of the trust, by signing their names to each bond."

The bonds thus authorized were issued, and were in the following words : " *United States of America, State of Alabama.* No. —. $1,000, Issue of $200,000 first mortgage bonds by the Tallassee Manufacturing Company Number One; the payment of which is secured by a mortgage on the lands, factory, buildings, and real estate of every kind, together with the machinery and franchises of the company. On the first day of January, 1881, the Tallassee Manufacturing Company Number One will pay to the bearer of this bond, at their office in Montgomery, Alabama, one thousand dollars, in gold coin of the United States, with interest thereon, at the rate of eight per-cent. *per annum*, payable semi-annually, on the first days of January and July each year, interest also payable in gold coin, at the National City Bank of New York, on presentation of the annexed coupons. This bond is issued by authority of an act of the legislature of Alabama, approved December 15th, 1870 ; and the payment of the same, and the interest thereon, is secured, under the provisions of said act, by a deed of trust executed this day to Charles T. Pollard and George Goldthwaite, of the city of Montgomery, State of Alabama, on the lands, buildings, machinery, and franchises of the company, with full power and authority to sell the same, after giving ninety days' notice, if the company shall

fail to pay the interest as it shall become due and payable, or the principal at maturity. In witness whereof, the president and secretary of the company have hereunto set their hands, and affixed the seal of the company, at Tallassee, this first day of January, A. D. 1871." As a further description of the bonds, it was alleged in the bill, that they were numbered consecutively from one to two hundred, "each bond having attached thereto twenty coupons, numbered the same as the bond to which they were attached; each being signed by B. D. Fry, the secretary of the company, and setting forth that the Tallassee Manufacturing Company Number One will pay the bearer forty dollars in gold coin, at the National City Bank of the city of New York; for six months' interest on the bond correspondingly numbered; the first of said coupons being due the first July, 1871, and successively on the 1st January and 1st July of each year until the 1st January, 1881, when the last will become due and payable."

The deed of trust which was given to secure the payment of these bonds, and which was dated the 8th February, 1871, recited and set out at length the special statute and the resolutions, under the authority of which the bonds were issued; and conveyed to Charles T. Pollard and George Goldthwaite, as trustees, certain lands, which were particularly described, "amounting in the aggregate to 5883 acres, more or less;" "also, the stone buildings known as the 'Old Factory' and the 'New Factory,' with all the water-wheels, engines, looms, spindles, and machinery contained therein, or appertaining thereto, or in process of erection, or which may be hereafter added or erected; also, the grist-mill, saw-mill, plane-house, and foundry, with all the machinery and appliances thereto belonging, or which may be added thereto; also, all offices, dwellings, tenements, stables, and other buildings now belonging to said company, or which it may hereafter acquire; also, all dams, canals, water-gates, or other constructions for the control of water-power, now completed, or which may hereafter be constructed; also, all franchises, rights and privileges, legal or equitable, granted by charter or otherwise to said company." The trusts of the deed were thus declared: "To have and to hold the above described property hereby conveyed, or intended to be conveyed, to the said trustees, and to their successors, as hereinafter provided, forever; but in special trust and confidence that, whereas in accordance with the authority above recited, the said B. H. Micou, president, has issued two hundred bonds, which are in words and figures as follows," setting out one of the bonds, and describing it as above: "Now, in case the said coupons and bonds shall be paid at maturity, then the estate hereby conveyed

OF ALABAMA.

[*In re* Tallassee Manufacturing Co.]

shall re-invest in the said Tallassee Manufacturing Company Number One, discharged of all trusts, and these presents shall be void. But, in case any of said coupons or bonds, or any one of them, shall not be paid at maturity, and default in the payment thereof shall continue for the space of thirty days ; then the said trustees, or either of them, or their successors in said trust, or either one of them, may enter upon said property hereby conveyed, or upon any part or parts thereof, and sell the same at public auction, for cash, in the village of Tallassee, Elmore county, giving at least ninety days' notice of such sale, by advertisement in some newspaper published in the city of Montgomery, and apply the proceeds of said sale, first, to the expenses thereof ; second, to the payment of such bonds or coupons as may be due and unpaid ; and, lastly, pay over the surplus, if any there be, to the treasurer, or other authorized agent of said company."

Another meeting of the stockholders was held, pursuant to the call of the president, on the 10th February, 1871, at which the president reported that he had the bonds prepared, and they were ready to be issued ; whereupon the following resolutions were adopted by the meeting : "*Resolved*, that the president is hereby authorized to declare a dividend of five per-cent. on the capital stock of this company, on the business of the year 1870, payable in the bonds of the company. *Resolved*, that in disposing of the two hundred thousand dollars of bonds, authorized to be issued, it is the sense of this meeting that it is better, if it can be so arranged, that the shareholders of the company should become the owners of the bonds, in preference to any other persons ; and the president and directors be hereby requested to arrange their financial plans, if possible, so as to retain the ownership of the bonds to the company, until they can be used to pay dividends to the shareholders ; but this resolution is not to be construed to prevent the use of the bonds, at their par value, in payment of any indebtedness of the company." At another called meeting of the stockholders, held on the 27th February, 1872, "at which were present B. H. Micou, T. M. Barnett, N. D. Barnett, D. Clopton, J. W. Durr, J. R. Browne, F. W. Jordan, — Rambo, and B. D. Fry," the president submitted his "annual report for the year 1871," in which he said : "In accordance with resolutions adopted at annual meeting of shareholders, I at once proceeded to the execution of mortgage and bonds for $200,000. Have sold no bonds. Have issued to shareholders, as dividends, 36 bonds, and hold 164. These have been used as a basis of credit in obtaining loans for the business of the company, but the ownership is still in the company. Have offered none for sale. Have

always considered that the bonds were issued as a financial measure, and advise that the company take measures to obtain ownership of those paid out as dividends, pay out no more, and, as fast as profits are made, or subscriptions received, to increase stock to retire the same; and when all have been retired, have mortgage cancelled."

On the 22d January, 1874, the corporation having become greatly embarrassed, if not insolvent, it executed a general assignment of all its property, to Josiah Morris, James A. Farley, George B. Holmes, J. Rhodes Browne, and R. F. Ligon, as trustees, who accepted the trust. The assignment contained the following recitals: " *Whereas*, the Tallassee Manufacturing Company Number One is largely indebted to various persons, and unable to meet its liabilities; and whereas the stockholders, in convention assembled, have resolved that it is expedient, for the purpose of securing such liabilities, to convey to trustees all the franchises, rights, property, and choses in action belonging or appertaining to said company, for the purpose of paying in full all the creditors; and the stockholders and creditors having selected, as trustees," the five persons above named; "and the said stockholders, in convention, having resolved that said conveyance should be made by the president of said company, with authority to affix the seal of the corporation thereto; and the creditors having assented to the terms herein stated: Be it therefore known," &c. The property conveyed by the assignment was described as " all the franchises, rights, property, assets, and choses in action belonging or in any wise appertaining to said company;" and the trusts were thus declared:

" 1. To hold, operate and manage all of said property, for the purpose of liquidating all the debts of the company; and to use all such means and income of the company as may be necessary to accomplish the object herein stated; and to this end, may employ such agents and employees as may be necessary. 2. To pay, as soon as, in the judgment of such trustees, it may be safely done, the sum of money borrowed by the company, on the credit of the directors and others, not to exceed the principal of $7,500. 3. To pay, as soon as, in the judgment of such trustees, it may be safely done, the amounts now due the operatives and employees of the company. 4. To pay, as soon as, in the judgment of said trustees, it may be safely done, small amounts that may be due by said company, for cotton furnished to said company, and to pay for the preparation of this deed. 5. To pay, *pro rata*, on all the debts of the company other than the bonds, interest at the rate of six per-cent. *per annum*, to be paid semiannually after the execution of this instrument. 6. To pro-

vide for and pay the interest on the bonded debt of the company, as the same may from time to time, and according to the terms thereof, mature. 7. As soon as practicable, to declare dividends on the debts of said company, other than the bonded debts, and to pay such dividends, *pro rata*, on such debts, until the whole of the debts and liabilities of the company, except the bonded debts, are paid ; and provided that, if said debts shall not be paid in full, at the end of five years from the sealing and delivery of these presents, then the whole unpaid *residuum* of debts of said company now existing, except the bonded debt, shall be and become presently due and payable ; and no dividends shall be paid to stockholders, until all existing debts are paid, except that, if the debts of said company, other than the bonded debts, are paid before the maturity of said bonds, then this trust shall cease." 8. Requires the trustees to make publication for creditors to come in and prove their debts. 9. Gives the trustees power to adjust all claims against the company, require proof of doubtful claims, arbitrate any claims for or against the company, and to obtain legal advice in the discharge of their duties. 10. Gives the trustees power, and requires them, "to make available for the payment of the debts of the company all dues and liabilities that have or may become due to said company;" but forbids litigation, "unless there is a probability of substantial pecuniary benefits therefrom." 11. Gives a majority of the trustees power to act. 12. Provides for filling vacancies among the trustees. 13. Requires the trustees to make out, on the 1st May, 1874, a balance-sheet of the property and operations of the company, and a monthly statement afterwards of the operations of the company. 14. "At the end of five years from the execution of this instrument, should the debts of the company, other than the bonded debt, be not paid in full, then the said trustees are authorized to advertise said property for sale, in some newspaper published in Montgomery, and at such other places as the trustees may deem advisable, for the period of ninety days, giving notice of time and place of sale, and may proceed to sell on the premises, to the highest bidder for cash, all or any part of said conveyed property, that may be necessary to pay such unpaid debts other than the bonded debt, and to convey title to the purchaser or purchasers ; and out of the proceeds the trustees will pay, first, the expenses of advertising, selling, and conveying said property; second, the unpaid balance of such debts, other than the bonded debt, that may remain unpaid, and the balance they will pay and refund to said company." 15. Requires annual meetings of stockholders to be held. 16. Provides

[*In re* Tallassee Manufacturing Co.]

for compensation of trustees.   17, and 18.  Provide for removal and vacancies of trustees.   "19.  Should it become necessary to borrow money for the purposes of this trust, the trustees are authorized to do so, and may, if necessary, secure the same by a lien on all or any part of the property of the corporation, in amount not to exceed fifty thousand dollars; such lien to be subordinate only to the lien to secure the bonded debt of two hundred thousand dollars."

On the 4th May, 1874, Charles T. Pollard and George Goldthwaite, as trustees in the mortgage or deed of trust for the security of the bonds, filed their bill in said Chancery Court, asking a foreclosure of the mortgage, an account of the operations of the factory under the management of the assignees, the appointment of receivers to manage the property under the orders of the court, and general relief.   The bill alleged the organization of the company under its charter, the passage of the statute authorizing the issue of the bonds, their issue, and the execution of the mortgage or deed of trust to secure them; also, "that all of said bonds have been issued, and are now in the hands of various persons, whose names are unknown;" that some of the coupons for interest, falling due the 1st January, 1874, were unpaid, to the amount of $16,000 or $17,000; that the indebtedness of the company amounted to more than $500,000, while its property was worth nearly $1,000,000; that its business was very large, employing several hundred operatives, and using twenty-five bales of cotton per day.   The bill further alleged the execution of the general assignment by the corporation, a copy of which was made an exhibit to the bill, and contained the following allegations in reference to it:   "That in the month of January last, the said company being unable to meet its liabilities as they matured, a meeting of stockholders and general creditors of said company was held in the city of Montgomery; at which it was determined that, in consequence of the embarrassed condition of the company, and the disastrous consequences that would result from a stoppage of the factory, it would be better for the company to make an assignment of all their property, for the benefit of all the creditors of the company; that at said meeting a very large proportion of the general creditors were represented, and the deed of trust, or assignment, hereto attached," &c., "was executed by said company, and assented to by said creditors;" that neither the complainants, nor the bondholders, had ever assented to the provisions of the assignment; that the assignees had taken possession of the property, and were operating the factory under the terms of the assignment; "that the rights of said trustees are subordinate to

the rights of the complainants, and that a receiver or receivers ought to be appointed by the court, who shall take possession of all the property of said company, and manage and operate said property, under the directions of the court, for the benefit of said bondholders and the general creditors of said company;" and that, in the opinion of the complainants, "it would be for the interest of said bondholders, as well as the general creditors, that said property should be managed and operated in accordance with the plan set out and provided for in said assignment, subject to such modifications and alterations as may, from time to time, be proper, under the directions of the court."

The corporation itself, and the trustees named in the assignment, were made defendants to the bill; and the prayer was, "that an account may be taken of the transactions and management of said trustees in operating said factory; that some proper persons may be appointed, to take possession of said property, and manage and operate the same for the purposes aforesaid, under the direction of the court," and for other and further relief. By an amendment of the bill, filed by leave of the court, the complainants further prayed a foreclosure of their mortgage, a sale of the property conveyed by it, and the appropriation of the proceeds of sale as the court might direct; and they also asked a reference to the register, to ascertain the number of bonds outstanding, the names of the holders, and the manner in which they acquired such bonds.

On the filing of this bill, May 4th, 1874, application being made for the appointment of receivers, the assignees, who were the defendants, were by consent appointed as receivers, but without bond, and were instructed by the order to operate and manage the factory in accordance with the provisions contained in the assignment, but subject to such modifications and directions as might be made by the court. An answer to the bill was filed by the corporation, alleging that the bonds were used by Micou, while president, without authority, and in violation of the resolutions by which their issue and use was authorized; denying their validity and binding obligation; denying, also, that its indebtedness was as great as alleged, and alleging that a great part of the indebtedness claimed was contracted by Micou without authority, including large sums charged for usurious interest; and requiring strict proof as to all these matters. A joint answer was filed by the assignees, requiring proof as to the validity of the bonds, the amount of indebtedness, and the value of the property, and admitting the other averments of the bill.

(37)

[*In re* Tallassee Manufacturing Co.]

On the 15th May, 1874, before the answers were filed, the chancellor made a decretal order, on motion of the receivers, directing the register to ascertain and report what would be a reasonable compensation for their solicitors, for services already rendered; and also "to ascertain and report the amount of the indebtedness of said company for money borrowed, on the credit of the directors of said company and others, not exceeding $7,5\0 of principal, the payment of which is provided for and directed by said deed of trust." The register's report under this reference is not set out in the transcript; but, at the same term, on the 30th May, the following decretal order was made in reference to the matters submitted: "This cause was submitted upon the bill and answers, and also upon the reports of the register made on the 19th and 30th days of May, 1874. It is ordered, adjudged, and decreed, that the receivers pay over . . to the attorneys of said trustees the amount of money respectively reported in their favor by the register, and also the amount borrowed by said company on the credit of the directors, as stated in the register's report, whenever, in their good judgment, such payments may be made without embarrassing the operations of the company. It is further ordered, adjudged, and decreed, that said bill is properly filed, and must be retained for the purposes therein specified." The decree further ordered the register to give notice for creditors to come in and prove their claims before him, and directed that "the company, or any stockholder or creditor, may file objections to any claim filed as aforesaid." At the ensuing August term, 1874, the time allowed for creditors to file their claims was extended to the 15th November then next.

On the 25th May, 1875, by leave of the court, Farley, Holmes, and Brown, the only acting receivers (the others having resigned), filed their bill in said court, setting out the proceedings already had under the bill of Goldthwaite and Pollard, and alleging that great embarrassments and difficulties had arisen in their administration of the trust, and there was danger of litigation and serious personal loss to them in the discharge of their duties; that claims had been filed against the company, amounting to more than $600,000, many of which were disputed, and of doubtful validity; that some of the stockholders and creditors also insisted that many of the mortgage bonds had been disposed of by Micou, as president of the company, without authority, and were not binding on the corporation, nor entitled to share in the benefits of the deed of trust to Pollard and Goldthwaite, and they required that these matters should be judicially settled. They therefore prayed that the court would take jurisdiction

*[In re Tallassee Manufacturing Co.]*

of all the matters growing out of the assignment, require all creditors to present and prove their claims, ascertain and declare all liens and priorities, give instructions to the complainants, from time to time, as might be necessary in the discharge of their duties, and finally settle the assignment. The corporation, and several persons who were alleged to assert rights as "new stockholders," but whose rights are not material as the case is here presented, were made defendants to this bill; and it was alleged that the persons claiming to be creditors were too numerous to be made formal parties. An answer to this bill was filed by the corporation, again denying the validity of the bonds; and answers were filed by the other defendants.

On the 7th June, 1875, the cause being submitted for decree, on the bill and answers, the chancellor rendered the following decree: "It is ordered, adjudged, and decreed, that the court ascertains from the pleadings that the Tallassee Manufacturing Company Number One is an insolvent corporation, and that the court take and assume jurisdiction of it as such, for the purpose of ascertaining who are the creditors of said corporation, the nature and amount of their claims, and the respective rights, interests, and liens of said creditors; and for the purpose of marshalling the assets, and of a settlement of the affairs of said corporation. And, for these purposes, it is ordered, adjudged, and decreed, that all persons claiming to be creditors of said corporation, whether as bondholders or otherwise, including those called in the bill 'new stockholders,' be, and are hereby, required to file their claims, together with the note, bill of exchange, certificate, or other written evidence thereof, and if bonds, a statement and description thereof, with the register of this court, by the 20th August, 1875. Each claim must be verified by the affidavit of the claimant, or some one who has personal knowledge of the same; which affidavit shall set forth the nature and amount or value of the consideration of such claim, and whether the same is held as collateral security or otherwise; and if held as collateral security, on what account. It is further ordered, adjudged, and decreed, that said corporation, or any stockholder or creditor, in the name of the corporation, shall have the right and be allowed to file with the register, at any time before the 20th day of September, 1875, objections in writing to any claim filed with the register; and thereupon an issue must be made up between the claimant and said corporation, in which the validity and correctness of such claim must be tried and determined by the register according to law." The time for filing claims, as limited by this decree, seems to have been extended, but the transcript

does not set out the order. The two bills seem to have been thenceforward treated as one cause, though the record does not show any formal order consolidating them.

On the 20th November, 1875, a claim against the corporation was filed by Lehman Brothers, a partnership composed of Emanuel and Mayer Lehman, doing business in New York, and in Montgomery through the firm of Lehman, Durr & Co. This claim was in the form of an account-current between said Lehman Brothers and said corporation, acting through B. H. Micou as its president, commencing in May, 1871, and showing a balance against the corporation, "average date due February 18, 1874, of $144,286.50. Attached to this claim was the affidavit of Mayer Lehman, to this effect: "that he is one of the firm of Lehman Brothers, of the city of New York; that the matters and things, as stated and set forth in the annexed statement, are just, true, and strictly correct in every particular, to the best of his knowledge and belief; that the demand of Lehman Brothers against the Tallassee Manufacturing Company Number One, as shown by the said statement, is just, due, and unpaid; that the same, *nor* any part thereof, has not been paid or settled by the said company, or by any person or persons for them; that there is no just set-off known to deponent, either in law or in equity, against said demand; and that there is now due, as aforesaid, the sum of $144 286.50, exclusive of any payment, set-off, or usurious interest, with lawful interest thereon from the 18th day of February, 1874. Deponent further says, that his said firm are the holders of forty first-mortgage bonds of the said company, issue of January 1st, 1871, of $1,000 each, numbered from 161 to 200, both of said numbers included, as collateral security for the acceptances of said company, which matured as follows: November 26th, 1873, $5,300; November 29th, 1873, $5,000; December 11th, 1873, $5,000; and December 12th, 1873, $5,300; and that they are also the holders of two of the first-mortgage bonds, numbered 41 and 132, as collateral security for a balance due on a payment made by order of said company to W. F. Smith, on the 13th and 16th days of December, 1873."

This claim was vigorously contested, and was the subject of several references and reports. In one of the affidavits attached to the claim, Emanuel Lehman stated, that the firm of Lehman Brothers was composed of himself and Mayer Lehman; but, on one of the references before the register, B. H. Micou thus testified: "Lehman Brothers became stockholders in the factory in 1869. The firm was generally represented at the meetings of stockholders by J. W. Durr, who became a member of that firm in June, 1870, and is still a

.member of the same; and he has been a director of the company since May, 1869." He further testified, that his transactions with Lehman Brothers, on account of the company, commenced in 1868; that the indebtedness to them, on the 1st January, 1870, amounted to about $77,000, "which consisted of drafts, drawn sometimes by Barnett, Micou & Co., and sometimes by B. H. Micou as president, and accepted by Lehman Brothers, and sometimes by B. H. Micou as president, and then indorsed by Lehman Brothers; that these drafts "were sent forward to borrow money on," to pay for machinery bought in Europe; also, "that the names of Lehman Brothers, as creditors of the corporation, do not appear on the books of the corporation at the Tallassee office; none of the details, stated in the accounts one to twenty, appear on the books at that office, and they only partially appear on the books of B. H. Micou, as president, in the office at Montgomery." An agreement in writing between Barnett, Micou & Co. and the corporation, acting by authority through Micou, its president, was also offered in evidence before the regieter, which was dated the 2d December, 1872, and contained these provisions: "In the event of the said company failing to pay any of said drafts now in existence, or any others, or other securities hereafter made as aforesaid, on which said Barnett, Micou & Co. may be liable for the benefit and accommodation of said company, and for the payment of which any of said bonds shall be deposited with the holders of such drafts or securities, as collateral securities, and the said Barnett, Micou & Co. shall pay any of said drafts or securities, or any part thereof, then the bonds so deposited, to an amount equal to the sum so paid by them, shall be delivered to and held by said Barnett, Micou & Co., as collateral security for the repayment to them of such sums so paid by them on account of the company; and the president of the said company is hereby directed to deliver the bonds, in the amounts aforesaid, so paid by said Barnett, Micou & Co.; and they are hereby authorized, on the delivery of said bonds to them as aforesaid, to pledge them as collateral security for the purpose of securing the payment of any debt they may incur on their own account, or to raise money thereon on their own account."

On the evidence adduced before him, the register made a special report on the claim of Lehman Brothers, allowing them $48,684.77 as a valid claim, and reporting that they held forty of the bonds of the corporation as collateral security for that amour.t, being the aggregate of four bills of exchange, for $10,000, drawn, indorsed, or accepted by Barnett, Micou & Co., on account of the corporation, with inter-

est thereon; and disallowing the residue of their claim. Exceptions to this. report were filed by Lehman Brothers, and also by the corporation and other creditors. On the hearing of these exceptions, August 5th, 1876, the chancellor ordered a second reference and account, directing the register to ascertain and report how much money Lehman Brothers had loaned to Micou, while acting as the president of the corporation, or had advanced for him in that capacity. Under this reference, the register reported that the amount so loaned to Micou, as president, or advanced for him, was "in the neighborhood of $100,000, which appears to be still unpaid;" and in reference to the forty bonds held by them, he further reported as follows: "Previous to 1871, B. H. Micou, purporting to act as the president ef said corporation, deposited with Lehman Brothers one hundred of said mortgage bonds of said corporation, as a security for a large indebtedness then existing. From time to time, as this indebtedness was reduced, certain of the bonds were withdrawn, until, in April, 1871, there remained in their hands forty of said bonds, with coupons thereto attached. By agreement with said Micou, purporting to act in this behalf as president of said corporation, Lehman Brothers were to hold these bonds and coupons as collateral security for all indebtedness of the factory, past, present, and future advances made thereupon. In April, 1871, Micou applied to Lehman Brothers for a loan of $40,000. They did not advance the money themselves, but indorsed Micou's paper to Kuhn, Loeb & Co. for said amount, and consented, Micou agreeing thereto, that said forty bonds, with the coupons attached, should be deposited with said Kuhn, Loeb & Co., as collateral security for such loan; and that said bonds and coupons, under said agreement, were so deposited with Kuhn, Loeb & Co., as security for such loan, and Micou obtained the money upon said paper so secured. When Micou's paper fell due, Lehman Brothers paid it, and received back the forty bonds, with the coupons attached; and they now hold and claim them as security for said $40,000 paid by them to Kuhn, Loeb & Co., as well as for all other indebtedness due them by said corporation, or incurred with them by said Micou, purporting to act as the president thereof. As the indebtedness due Lehman Brothers is greater than the value of said forty bonds and attached coupons, the register is of the opinion that, on this part of their claim, Lehman Brothers should be allowed to recover to the full amount of said bonds and coupons, and so reports."

Exceptions were filed to this report by Lehman Brothers, because the register did not allow the full amount of their claim; and by the corporation and contesting creditors,

[*In re* Tallassee Manufacturing Co.]

because he allowed their claim as *bona fide* holders of the forty bonds. On the hearing of these exceptions, the chancellor sustained those filed by the corporation and contesting creditors; examining the evidence in detail, pointing out discrepancies in the statements of the witnesses and in the accounts furnished from time to time, and thus stating his conclusions: "Considering the contradictory evidence as to when, how many, and for what purpose, bonds were placed with claimants; considering the fact that they have endeavored to conceal the fact that the bonds were left with them as security for an antecedent debt; considering the fact that, while they were dealing with Micou as president of the factory, they were speculating with him in cotton 'futures,' whereby they won about $30,000 more than they lost, which winnings were debited against the factory, and are the basis of part of their claim; considering the fact that they were stockholders, and one of the firm was a director of the corporation; that they were receiving dividends, which they knew were illegally paid, in that they knew Micou, as president of the factory, was running and extending its old obligations, again and again, at usurious rates, costs, and commissions, and that therefore there were no net profits, out of which to pay dividends; considering that, by their action, they were helping Micou to roll along an old debt, the existence and amount of which was concealed from stockholders and creditors, and which gathered size and weight as it progressed, and, by their action in this respect, were assisting Micou in keeping up a deceptive appearance of solvency and ability to pay dividends, whereby other persons were induced to pay money for new stock, and others to give credit: considering all these facts and circumstances, it is ordered and decreed, that said claimants are not *bona fide* holders of the forty bonds."

On a third reference of the matters of account connected with the claim, the register reported as the amount due to Lehman Brothers, "on original transactions with said corporation," the sum of $123,629.40; and further, that they held the forty bonds as collateral security for this debt. On exceptions by the contesting creditors to the latter part of the report, it was corrected by striking out that part, and confirmed in all other respects. Lehman Brothers appealed from the chancellor's decree, disallowing their claim to hold the forty bonds, and here assign it as error.

One of the claims filed against the corporation, under the order of the court above mentioned, was in favor of David Clopton, C. L. Matthews, and George Goldthwaite, for money

paid under the following circumstances, as stated in the accompanying affidavit of Clopton : " In November, 1873, the president of said corporation represented to the directors, in substance, that, owing to the then financial troubles of the country, it was necessary for the directors to come to his aid, and raise about $15,000 for him, by individually indorsing notes or bills. Two of the directors, owing to reasons peculiar to themselves, declined to indorse, but said they would furnish $1,500 each in money. The president further stated, in substance, that the factory had some cotton pledged as collateral security for money previously procured, and, by the use of said notes or bills, he could procure the release of this cotton, and work it up, and would be able to run said mills, and to pay said notes or bills out of the weekly products. To this purpose, bills of exchange were indorsed, of which the seven annexed constitute a part. These seven bills were paid, after several renewals and extensions, by George Goldthwaite, C. L. Matthews, and this affiant, in equal parts ; the amount of principal and interest paid by them being $7,758.53. Said bills of exchange are not [held] as collateral security, and are the same bills for the payment of which, by the receiver, an order has been heretofore made by the court." The affidavit of Matthews was also subjoined, as follows : " The above statements are true, except that my recollection differs from Mr. Clopton, as to the amount in money to be advanced by Durr and Farley."

No objection seems to have been made to the allowance of this claim ; and at the May term, 1878, the register reported the amount due the claimants, with interest up to May 13th, 1878, to be $9,776.83. At the same term, the claimants filed their petition, asking for an order to the receivers to pay them the amount so reported, " it appearing from the report of said receivers that they have sufficient assets from which to pay the same." The petition was ordered to stand over until the next term ; and at that term the following decree was rendered : " After a careful examination of the matter, the court is of the opinion that the petition of Matthews, Clopton and Goldthwaite, to have refunded to them, out of the money in the registry of the court, the money borrowed by the corporation on their credit, should not be granted. The solicitors of the petitioners insist, that this should be paid as a preferred claim, by virtue of the second clause of the assignment executed by the corporation, which directs the trustees to pay, as soon as, in their judgment, it could safely be done, the money borrowed by the corporation ' on the credit of the directors and others'; and the deed recites, that the creditors assented to its terms. What particular

debt is meant, does not appear by the deed, nor do the names of the ' directors and others' appear. There is no question made, however, that the petitioners were the parties referred to. The trustees never paid them, nor have their claims been paid by the receivers since the property was brought into this court for administration. The net profits realized by the receivers have not been sufficient, after payment of solicitors' fees to the extent of $13,387, and the other necessary expenses incurred by them, to pay the petitioners' claims. It was never contemplated that money should be borrowed, to enable the trustees or receivers to pay this claim. It is true the receivers have paid into court a sum of money larger than the petitioners' demand; but most of this arose from sales of property, ordered to be sold when the mortgage was foreclosed, and decree of sale enrolled. The court is of the opinion, that, as to the surplus proceeds of sale, left in court after paying the bonded indebtedness, the petitioners should not be allowed precedence over other unsecured creditors, but should stand upon the same ground, and share *pro rata;* and it is so ordered and decreed."

From this decree said petitioners appeal, and here assign it as error.

Stone & Clopton, attorneys, having rendered professional services for the corporation pending the litigation, filed their petition, asking a reference to the register to ascertain and report what would be reasonable compensation for their services; and the register having reported that their services were reasonably worth $2,500, they moved the court " to authorize and direct the register to pay to them, out of the money paid into court by the receivers, the sum of $2,500 allowed them under a former order of the court." On this motion, at a subsequent day, the court rendered the following decree : " It appearing that the corporation is insolvent, and that the fund in court will pay but a small per-cent. of its debts, the court is of opinion, that the fee of its solicitors should not be allowed as a preferred claim to be paid out of such fund ; and it is so decreed. After deducting from the fund in court such costs, fees, and allowances hereinabove taxed against the fund, the register will proceed, without delay, to pay the balance, *pro rata*, to the unsecured creditors." From this decree Stone & Clopton appeal, and here assign it as error.

D. S. TROY, for Lehman Brothers, appellants.—The validity of the appellants' debt against the corporation, to the amount of $123,000, is established beyond judicial controversy, after

[*In re* Tallassee Manufacturing Co.]

a protracted contest, and repeated references to the register; and the only question presented by their appeal is their right to hold the forty bonds as collateral security for this debt, which the chancellor disallowed. The terms of the agreement, under which they received the bonds, are fully proved by the testimony of Micou and the Lehmans, which is not contradicted; and the agreement itself, as proved, is within the purposes for which the use of the bonds was authorized by the resolutions of the directors. The agreement being valid, and their debt still unpaid, their right to hold the bonds necessarily follows. The appellants make no claim to any part of the money in court arising from the sale of the property not covered by the mortgage; and their right to share in the proceeds of the property which was covered by the mortgage can not be denied. As to their right to share in the net profits realized by the receivers from the operations of the factory, see Jones on Mortgages, vol. 1, §§ 670–71; 2 *Ib.* § 1536; Hilliard on Mortgages, p. 180, § 38; *Hutchinson v. Dearing*, 20 Ala. 798; High on Receivers, §§ 643, 688.

D. CLOPTON, H. C. SEMPLE, and T. M. ARRINGTON, for Matthews, Goldthwaite, and Clopton, appellants.—1. These appellants have a right, legal and equitable, superior to all others, to be paid out of the proceeds of the property not covered by the mortgage. The peculiar merit of their claim was recognized and admitted by all parties, throughout the entire litigation; provision was made in the assignment for it, as a preferred claim, and its payment was ordered by the chancellor at an early stage of the cause. The original bill averred that it would be for the interest of all parties concerned that the property should be operated and managed according to the plan provided in the assignment, subject to such alterations and modifications as the court might, from time to time, direct; and it was so operated and managed by the trustees, as receivers, without modifications made or asked. The original bill did not claim or assert that the assignment should enure to the equal benefit, *pro rata*, of all the creditors; and no such claim was at any time asserted by any creditor, by cross-bill, petition, or otherwise. This was the case made by the pleadings; and the chancellor had no power, *ex mero motu*, in disregard of the pleadings, to declare that the assignment should enure to the benefit of all the creditors. The statutory right given to the creditors may be waived, and it is waived by a failure to assert it.—*Du Bose v. Carlisle*, 51 Ala. 592; *Aurora City v. West*, 7 Wallace, 82; Mitford & Tyler's Pl. and Pr. in Equity, 373; *African Co. v. Parish*, 2 Vesey, 244; *Harrison v. Mock*, 10 Ala.

195; 16 Ala. 624. That a creditor, coming in under a general decree in favor of creditors, and desiring relief not asked in the original bill, may file a cross-bill, see Story's Eq. Pl. § 397; *Latouche v. Dunsany*, 1 Sch. & Lef. 149; *Cullum v. Irwin*, 4 Ala. 461; *Armstrong v. Pratt*, 2 Wis. 218. But this waiver and assent are not left to implication alone. The assignment itself recites, that the creditors assented to its terms; and that fact is also averred in the bill filed by the trustees, and is not denied by any one. Having once assented to its terms, a creditor must afterwards abide by them, unless he can show fraud, or some other sufficient reason. This recital and averment explain why no creditor invoked the application of the statute. If any one had applied, an issue might have been formed, and an opportunity afforded to prove his assent. Having failed to make such application, the assent of every creditor is conclusively presumed.

2. These appellants have a superior equity to be paid out of the earnings of the property while it was operated by the receivers. The money was advanced by them to procure the release of the cotton held as collateral security, under the assurance and understanding that they should have a lien on the goods manufactured out of it; and this cotton was in process of manufacture when the trustees took possession under the assignment, and while they operated the factory as receivers. The net earnings of the property, realized by the receivers, were not necessarily the property of the bondholders, at whose instance the receivers were appointed. "The possession taken by the receiver is only that of the court, whose officer he is, and adds nothing to the previously existing title of the mortgagees. He holds, pending the litigation, for the benefit of whomsoever, in the end, it shall be found to concern, and, in the meantime, the court proceeds to determine the rights of the parties, upon the same principles it would if no change of possession had taken place."— *Fosdick v. Schall*, 99 U. S. (9 Otto), 135–51; also, *Hale v. Frost, Ib.* 389; *Douglas v. Kline*, 12 Bush, Ky. 608. If no change of possession had here taken place, or rather no change in the character of the possession (for the trustees continued in possession as receivers), it can not be doubted that the equity of these appellants might have been enforced against the goods manufactured out of this cotton; and the court will enforce it out of the net earnings of the property, in the absence of any superior claim. The remarks of the court in *Fosdick v. Schall*, *supra*, as to the rights of railroad mortgagees when receivers are appointed at their instance, apply with equal force to the mortgagees of a large factory, as in this case.

The receivers were appointed at the instance of the mortgagees, and for their benefit; and in operating the factory, they necessarily used property not covered by the mortgage, and to which these appellants had a superior claim and equity. Thus a confusion of the earnings has resulted, which the record furnishes no means of correcting; and the mortgagees must suffer the consequences of their own proceedings.

D. Clopton, and H. C. Semple, for Stone & Clopton, appellants.—It is a general rule, established by the practice in courts of equity, that when a fund in court has been benefitted by the services of counsel, the court will allow a fee for such services out of the fund. In this case, the fund was already in court; and the corporation, being insolvent, had no pecuniary interest in the litigation over it; and thus the services of counsel, though nominally rendered for the corporation, enured to the benefit of the creditors generally, and should be paid out of their fund. The necessity and value of the services of the appellants was determined on a reference to the register, and neither was disputed; and public policy requires that they should be paid out of the fund in court.

Thos. H. Watts, with whom was D. T. Blakey, for the unsecured creditors, appellees in each case.—1. The claim of Lehman Brothers to hold the forty first-mortgage bonds, as collateral security for their debt, can not be sustained, because there is a fatal variance between the pleadings and proof in reference to their claim. The affidavit to the claim, as originally filed, declared that they held these bonds " as collateral security for acceptances of said company, which matured as follows," specifying four bills of $5,000 and $5,300 each ; and this claim or affidavit was never changed or amended in this respect. There is no averment that the bonds were held as collateral security for any general balance on account, and no assertion of a banker's lien. If any agreement at all is proved, it is that they were deposited as collateral security for the four bills of Kuhn, Loeb & Co., of $10,000 each, which are nowhere mentioned in the affidavit or claim. Such a variance between the pleadings and proof would be fatal to a claim filed against an insolvent estate ; and it must be equally fatal in this case, which was the settlement of the affairs of an insolvent corporation, whether tested by the rules governing the contest of claims against an insolvent estate, or by the general rule of chancery practice, which requires substantial correspondence between the pleadings and proof.—*Paulding v. Lee & Ivey*, 20 Ala. 753 ; *Crothers v.*

[*In re* Tallassee Manufacturing Co.]

*Lee*, 29 Ala. 337; *Flake & Freeman v. Day & Co.*, 22 Ala. 132; *Cowan v. Jones*, 27 Ala. 317; *Lockhart v. Cameron*, 29 Ala. 355; *Brantley v. West*, 27 Ala. 542; *Crabb v. Thomas*, 25 Ala. 212.

2. But Lehman Brothers can not be considered *bona fide* holders of the bonds for any purpose. Until the passage of the special statute authorizing the issue of these bonds, the corporation had no authority to borrow money, or to make mortgages; and especially had it no authority to mortgage its franchise. The statute does not specify the purpose for which the bonds were to be issued, and the resolutions of the stockholders were necessary to authorize their issue. These resolutions specify the purposes for which the bonds may be used, and they could be lawfully used for no other purpose. The only purposes specified, as to their use, were—1st, to raise money to carry on the business of the company; 2d, in payment, at par, of any existing indebtedness. These resolutions were the law by which the use of the bonds was to be governed, and no one could be a *bona fide* holder who acquired them in violation of these resolutions, especially if he were a stockholder and director of the company, and chargeable with knowledge of all its affairs.

Again, Lehman Brothers, on the facts proved, do not come into court with clean hands. They alone, besides Micou, knew the exact condition of the company, and the extent of Micou's mismanagement; and they were well acquainted with all these facts when, by a vote of the shareholders, the issue of new stock was authorized, which the chancellor held to be a fraud, and therefore placed the new stockholders on the footing of creditors. One member of their firm was a director, and represented them at each meeting of stockholders; and he was present at every meeting of the directors shown in the record. As a director, if not as a stockholder, it was his duty to disclose to the others all that he knew about the condition of the company's affairs; and if he had done so, it can not be doubted that the new stock never would have been issued, and proper steps would have been taken to check the recklessness and gross mismanagement which had brought the company to the verge of insolvency. Especially was this duty incumbent on him, when he knew that the books of the company at Tallassee, to which the other stockholders had access, did not disclose the transactions between his firm and Micou. He knew, too, when Micou was reporting dividends to be declared, that the company was making no profits, but was largely in debt; and by receiving these dividends, his firm was enabling Micou to keep up deceptive appearances, and roll along an increasing debt. They were Micou's bank-

ers, also, through whom all his speculations in cotton were conducted; and, according to the chancellor's finding, from the accounts submitted, they realized a profit of $30,000 at his expense in these transactions. They received a part of the bonds distributed as dividends, and $100,000 of the money paid in by the new stockholders went into their hands. They are chargeable with full knowledge of all Micou's misconduct, and can not claim protection as *bona fide* holders of the bonds. The bonds are not commercial paper, and were never indorsed to them; and they are subject, in their hands, to any defense the company may have against them.—*Blackman v. Lehman, Durr & Co.*, at the last term.

3. The bondholders can claim no part of the money in the registry of the court, arising from the sale of the property not covered by their mortgage; nor ought they to be allowed to participate in the net earnings of the property while in the hands of the receivers. These earnings were derived from the use of the entire property, and the record does not furnish the means of apportioning them, or separating the portion derived from the mortgaged property from that which was derived from the other property. The income of the mortgaged property is not pledged by the mortgage, nor is any reason shown for intercepting it; and a large portion of the earnings, including $13,000 solicitors' fees, has already been appropriated for the benefit of the bondholders. The balance in the registry of the court should go to the unsecured creditors.

4. The claim of preference advanced by Matthews, Clopton, and Goldthwaite, can not be supported. The promise of Micou, upon the faith of which they procured the release of the cotton, gave them no lien on the cotton, nor on the goods manufactured out of it. The assignment gave them no lien, and only a conditional preference; and the interlocutory order of the court, in their favor, was also conditional. As directors, they participated in the making of the assignment; and they could not thereby secure a preference or benefit to themselves, at the expense of the creditors. They are charged with knowledge of the statute, which abolishes all preferences in a general assignment.—Code, § 2126. The recitals of the assignment do not conclude any creditor who was not a party to it, and whose express assent is not shown; and there is no evidence that any creditor ever assented.

5. The attorneys of the insolvent corporation were employed to defend it against the suits of its creditors, seeking to subject its property to the payment of its debts. They brought no fund into court, and have no claim on the fund which the creditors have succeeded in bringing in. Each creditor had

[*In re* Tallassee Manufacturing Co.]

his own attorney, and it would be unjust to compel them to pay the costs of the corporation, which was not bound to make any defense.

BRICKELL, C. J.—These are appeals from a decree of the Court of Chancery, rendered in the progress of a suit for marshalling and distributing the assets of the Tallassee Manufacturing Company Number One, an insolvent corporation, disallowing priorities claimed by the several appellants as creditors. The point of contention in the first case is, whether the appellants, Lehman Brothers, are the holders for a valuable consideration, and in good faith, of forty of the mortgage bonds of the corporation, entitled to the security of the mortgage.

It is ascertained, after a rigorous contest by the corporation, and by opposing creditors, that Lehman Brothers were *bona fide* creditors of the corporation, to an amount exceeding one hundred and twenty-three thousand dollars. The amount was ascertained on a reference to the register, and his report of it, though excepted to because it affirmed these bonds were a collateral security for the payment of the debt, was not in any other respect made the subject of exception, and was confirmed. It is thus judicially ascertained, and the ascertainment is now conclusive on all parties to this suit, that Lehman Brothers are *bona fide* creditors of the corporation, to the amount reported by the register.

The authority of the corporation to issue the bonds, and to execute the mortgage as a security for their payment, is not disputed. Nor is it matter of controversy, that Micou, the president, had full authority to raise money for the corporation, either by a sale of the bonds, or by hypothecating them as security for the bills or notes of the corporation, given in raising money for its use. The use of the bonds, *as collateral security to raise money to conduct the business* of the corporation, was one of the purposes of issuing them, announced and concurred in by the stockholders, when authority for the issue was conferred. Nor can it be matter of controversy, that the bonds could be used, not only as collateral security for debts presently created, but that they could also be used in paying the indebtedness of the company antecedent to the time of their issue, or to the time authority for their issue was conferred. Such use is contemplated by one of the resolutions adopted by the stockholders at the time their issue was authorized.

Independent of these facts, the bonds could be employed as collateral security for antecedent debts, or in the absolute payment of such debts. The corporation was created for

commercial purposes; and one of its implied powers is to deal on credit, for any proper corporate purpose, in the usual and ordinary mode of conducting its business, under the circumstances in which it may be placed. It would unnecessarily embarrass its operations to declare that these bonds could be employed in paying antecedent debts, but not in hypothecating them as security for such debts, though by the hypothecation forbearance could be obtained, and the debts paid eventually without an absolute, unconditional transfer of the bonds. This implied power is not limited or restrained by the resolution of the stockholders, authorizing the use of bonds in payment of the antecedent indebtedness of the company. Whether hypothecated as a security for such debts, or applied directly to their satisfaction, they are used in paying the debts, in relief and ease of the corporation, and the objects of the resolution are satisfied.

A controlling object of the stockholders, expressed in the resolutions, was, that the bonds should, if possible, in the course of the business of the corporation, pass to and become the property of the stockholders. This object would more probably have been accomplished by the hypothecation of the bonds, subject to redemption by the corporation, than by their unconditional negotiation and transfer, without the right of regaining them. It does not seem to us, consequently, a matter of any practical importance, in determining the rights of Lehman Brothers to hold these bonds, and to enforce the security of the mortgage for their payment, to enter into any extended consideration of the inquiry, whether they acquired possession of the bonds as collateral security for an antecedent debt, or for a debt presently created. Whether the one or the other was the mode of acquisition, the debts being unpaid, their rights would be the same.

*Good faith* must, however, have attended the transaction, by which they obtained possession of the bonds; and an absence of it would be as fatal to their right to hold and enforce them, as the want of a valuable consideration, or of power in the corporation, or of authority in the agent or officer with whom they negotiated, to make the transfer. It is *good faith* in the particular transaction which is material, and not in other separate and distinct transactions. The want of it in other transactions, which may be open to criticism and censure, while it may justly excite jealousy, and arouse suspicion, compelling a diligent scrutiny of the particular transaction and all its attendant circumstances, can not impair or destroy rights which may have been acquired under it.

The legislative authority under which these bonds were

issued manifestly contemplates the issue of instruments having all the qualities, elements, and characteristics of negotiable paper, which could be introduced into the commercial markets, circulating and passing as such paper circulates and passes in the usual course of business; and in this respect it differs essentially from the legislative enactment which was considered in *Blackman v. Lehman, Durr & Co.*, at the last term. The bonds are payable absolutely, at such place as the corporation may appoint, with coupons for the annual interest attached. The bonds of railroad and other corporations created for commercial purposes, which had been introduced, and had by the usages of trade and commerce, sanctioned by judicial decision, acquired all the characteristics and qualities of bills of exchange and bank-notes, as strictly negotiable as such bills and notes, were within the legislative contemplation; and this was the instrument, though denominated a bond, it was intended the corporation should issue. The issue of another instrument, not having the capacity of negotiability, and to which the credit of commercial paper could not be attached, would not have facilitated the purpose of borrowing money—the end to be accomplished.

Whoever is found in possession of negotiable paper, is presumed to hold for value, and in good faith. The possession is the evidence of right and title, upon the faith of which business is safely conducted, and from which, whatever may be its infirmity, an indefeasible title may be derived, by a *bona fide* purchaser for a valuable consideration, so long as the paper is not dishonored. The presumption, arising from possession, can be repelled, only by clear, distinct allegations of a want of consideration, or of a want of good faith in its acquisition.—*Bronson v. La Crosse*, 2 Wall. 283. True, under our decisions, when any infirmity in the paper itself is shown, the burden of proving its acquisition for value, and in the usual course of trade, is cast on the holder who claims protection against the defense. No infirmity in these bonds is averred—no want of legal obligation in them is the subject of controversy : the contention is, that they have not been negotiated in the usual course of business, to the appellants, who are found in possession of them. The possession must have all the strength and force of evidence of right and title, which is accorded to the possession of any other species of personal property. The burden of proof cannot be shifted, except by evidence directed against the possession, and the manner of its acquisition.

Even if there was, in the course of the long dealing between the appellants and the corporation, and between them and Micou individually, much which is open to censure, and

(38)

which may have provoked general, sweeping charges of fraud and collusion with Micou, in his wild and unfortunate speculations, involving himself and the corporation in financial ruin, and bringing disaster upon those who trusted him implicitly; such allegations cannot be considered, unless it is affirmatively shown that the particular transaction, by which these bonds came to the possession of the appellants, was infested with such fraud and collusion; or the debt, for which it is claimed they are a security, is tainted with fraud. If the debt was so tainted, it ought to have been made the subject of contestation; and it was the matter of protracted and vigorous litigation. From the debt, under the decree of reference last made, every false or improper charge, entering into the account of the transactions between the appellants and the corporation, was eliminated; and eliminating every one that was offensive to good faith and fair dealing, limiting the liability of the corporation solely to debts it had the capacity to contract, and which were contracted for its benefit, by its authorized agent, the large balance is shown and ascertained to be due the appellants. That the existence of a large debt to the appellants may not have been communicated by them to other stockholders of the corporation, is a fact directed against the existence of the debt; as is the fact of any irregularity in the mode of keeping, or presenting the accounts. Nor can we perceive that special importance should be given the fact that appellants, as stockholders, received dividends, while the debt to them was being contracted. Corporations of this kind must necessarily conduct business largely on credit; and it cannot be unusual for them to pay dividends, while large debts exist against them.

Besides, it is a fair inference, that appellants were under the belief that the whole indebtedness of the corporation was to them, or known to them; and that would not have seriously embarrassed the corporation, or have impaired its credit. The facts have not, however, in them, any element of estoppel; for, upon them it is not shown that reliance was placed by any person, who will be injured by their explanation, or by evidence which neutralizes and removes all inferences which may be drawn from them. And they have, if any, a very remote bearing upon the controlling question, the good faith of appellants in obtaining possession of the bonds, upon a valuable consideration. The presumption, which naturally and logically arises from the fact of possession, that the appellants are holders in good faith, and for value, of the bonds, must be repelled, by clearer averments, and more direct evidence, addressed to the manner of its acquisition, there are to be found in this record.

The fact is undisputed, that for a series of years the appellants had been the bankers of the corporation, advancing and loaning it money, and obtaining for it advances and loans. The amount now due them is the balance of these continuous dealings, after discarding all objectionable items of account. Nor is it a disputable fact, that originally these bonds, with sixty others, were placed in the possession of the appellants, to protect them against liabilities which they had incurred, or were expected to, and did subsequently incur, and to secure them for debts due them, and which it was supposed would be, and were subsequently, contracted with them. The rule is broadly stated, that a bank or banker has a lien on all moneys and funds of a customer, coming into his or its possession in the course of their dealings, for any balance of general account due from the customer. The lien is similar to the well-established lien of a factor, for a balance of general account, on goods of the principal coming to his possession, and is subject to similar limitations and exceptions.—Morse on Banks, 24. In *Davis v. Bowsher*, 5 T. R. 492, it was ruled by Lord KENYON, that bankers have a lien on securities in their hands, for a general balance of account, if they were not delivered under a special agreement, with which the lien would be inconsistent. In *Bank of the Metropolis v. New England Bank*, 1 How. (U. S.) 234, C. J. TANEY, in delivering the opinion of the court, said : "It has been long settled, that whenever a banker has advanced money to another, he has a lien on all the proper securities which are in his hands, for the amount of his general balance, unless such securities were delivered to him under a particular agreement." By a particular agreement, the lien may be excluded; but express agreement is not essential to its origin or continuance. It is given by the law, upon the presumption that it is upon the faith of moneys and securities coming into the possession of the banker, in the course of general dealings, not especially devoted to other uses, a balance is suffered to accumulate against the customer. Independent of any express agreement that these bonds should be held by the appellants as collateral security for the general balance of account, or to protect them against liability on bills indorsed for the corporation, they have a clear legal right to retain and enforce them for the balance ascertained to be due them. Nor can we see how it can be doubted, that there was an express agreement that they should be retained as collateral security for the payment of the bills of exchange, drawn by the corporation, indorsed by the appellants, and subsequently paid by them, which were held by Kuhn, Loeb & Co. There is positive and uncontradicted evidence of the agreement. But,

in either alternative, their right is clear, and ought to have been recognized and enforced.

The funds now under the control of the court, and which are to be distributed under its decree, are derived from three distinct sources : *First*, from the sale of the mortgage property ; *second*, from the profits earned by the receivers in operating the factory under the directions of the court ; *third*, from the proceeds of the sales of property not incumbered by the mortgage, or any other specific lien. As to the distribution of the first and third funds, there is no contention ; it being conceded the first must be applied to extinguish the mortgage debt, and that the third is for the common benefit of the creditors. The second is the subject of controversy.

There is in the mortgage no express grant of the income or profits, which may be derived from operating the factory. The grant is of the real estate, and the " stone buildings known as the old factory and the new factory, with all the water-wheels, engines, looms, spindles, and machinery contained therein, or appertaining thereto, or in process of erection, or which may hereafter be added or erected ; also, the grist-mill, saw-mill, plane-house, and foundry, with all the machinery and appliances thereto belonging, or which may be added thereto ; also, all offices, dwellings, tenements, stables, and other buildings, now belonging to said company, or which it may hereafter acquire ; also, all dams, canals, water-gates, or other constructions for the control of water-power, now completed, or which may hereafter be constructed ; also, all franchises, rights, and privileges, legal or equitable, granted by charter or otherwise to said company."
If there was default in the payment of the bonds, or the coupons for annual interest, continuing for thirty days, the trustees were required to take possession, and to make sale, after giving ninety days' notice. The factory, as an operating and going concern, was conveyed, and was to be sold. Its operation by the trustees, for the benefit of the bondholders, is not contemplated ; nor was it contemplated that the profits derived from it should be specifically appropriated to pay the bonds, or the interest accruing on them. Such profits were not a fund, in the hands of the corporation, for the payment of one debt more than another.

So long as a mortgagor remains in possession, the rents and profits of right belong to him, and he may receive and apply them to his own use. This principle has been applied to mortgages of railroads, expressly embracing the tolls, rents, and profits which would be gained from its operation, when it was contemplated that the mortgagor should remain in possession until default in the payment of the mortgage debt,

taking and receiving them; and a decree of foreclosure, silent as to the rents and profits, would not change the right to them.—*Gillman v. Ill. & Miss. Tel. Co.*, 91 U. S. 603; see, also, *Galveston Railroad v. Cowdrey*, 11 Wall. 459; *American Bridge Co. v. Heidelbach*, 94 U. S. 798; *Fosdick v. Schall*, 99 U. S. 253.

When a mortgagor in possession has made default in the payment of the mortgage debt, and is insolvent, the mortgage not being an adequate security for the payment of the debt, or there is imminent danger of waste or destruction of the property, the mortgagee, instituting a suit in equity for a foreclosure, may obtain the appointment of a receiver, to take possession, and secure the rents and profits; and in this way fasten a specific lien upon the rents, to meet any deficiency of the mortgage debt.—High on Receivers, §§ 639 *et seq.* The appointment of a receiver is an extraordinary remedy, and, like the grant of writs of *ne exeat*, or of interlocutory injunctions, rests largely in the discretion of the court, and is controlled by the peculiar circumstances of each case.—High on Receivers, § 7. It is said by C. J. WAITE, speaking for the Supreme Court: "That when a Court of Chancery is asked by railroad mortgagees to appoint a receiver of railroad property, pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income, during the receivership, of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property, as may, under the circumstances of the particular case, appear to be reasonable."—*Fosdick v. Schall*, 99 U. S. 251. The further observation is made, in reference to railroad mortgages, which seems to us applicable to mortgages by manufacturing and commercial corporations, generally, that they "are comparatively new in the history of judicial proceedings. They are peculiar in their character, and affect peculiar interests. The amounts involved are generally large, and the rights of the parties oftentimes complicated and conflicting. It rarely happens that a foreclosure is carried through to the end, without some concessions by some parties from their strict legal rights, in order to secure advantages that could not otherwise be attained, and which it is supposed will operate for the general good of all who are interested. This results, almost as a matter of necessity, from the peculiar circumstances which surround such litigation."

The receivers were originally appointed in the progress of the suit for a foreclosure of the mortgage, after the corporation had become insolvent, and had made a general assign-

ment of all its property, including that which was, and that which was not covered by the mortgage. The results of its insolvency, and of the assignment, were, that it was incapable of conducting its business, suspended in its functions, and for all practical purposes in a state of dissolution. There was imminent peril of waste and destruction, not only of the mortgage property, but of the other corporate property, parts of which were necessary to the operation of the factory, which could not lie idle pending the litigation, without serious deterioration in value. With the consent of the assignees, and without dissent from any of the parties in interest who were then before the court, or who subsequently came in, receivers were appointed, who were authorized to take possession of all the property of the corporation, and to operate the factory in accordance with the provisions of the assignment, subject to such directions and modifications as the court from time to time should make. Under this order, using such of the corporate property not mortgaged as was necessary, the receivers operated the factory, and realized the net profits now in the registry of the court. *Prima facie,* so much of this fund as was derived from the use of the mortgage property should be applied to the payment of the mortgage debt. There was no order of the court made when the receivers were appointed, or ·at any time during the progress of the suit, diverting it from this appropriation; and no peculiar equity in favor of other creditors is shown, which would repel the *prima facie* right of the mortgagees, and justify its diversion. But there is no equity in the application of the whole fund to the mortgage debt. Such an application would compel the general creditors to contribute from a fund or source of payment upon which they have equal claims with the mortgagees, to the satisfaction of the mortgage debt. Each fund the court should preserve and distribute for the benefit of the creditors having claims upon it. When the appointment of receivers was made—when it was found necessary, for a longer or shorter period, to operate the factory—in view of the temporary necessity, it was not inequitable to authorize the receivers to use, so far as was necessary, the property not covered by the mortgage. Equity requires, however, that the use should not be at the expense, and to the injury, of the general creditors, the benefits being realized solely by the mortgagees. The general creditors, represented by the assignees, then before the court, under the circumstances, could properly, for the convenience and interest of all, be required to concede the use of the property from their strict legal rights to it, and its immediate reduction to money by a sale; as the mortgagees could be required to concede from

[*In re* Tallassee Manufacturing Co.]

their strict legal rights, that from the earnings of the mortgage property outstanding debts for labor, supplies, &c., should be paid. True, such conditions were not incorporated in the order appointing the receivers; but they are officers of the court; their possession is that of the court; the fund in their hands is in the custody of the court; and rights are not diminished or enlarged by the generality of the terms of their appointment. The court has the power, and can at any proper stage of the proceedings, declare the rights of the parties, and order the application as is just and equitable of the funds which have been derived by the receivers' operations under its direction. The duty of the court is to take care that the funds are applied so as to meet the equities of the parties. There can be no confusion of them, so that one party obtains an undue advantage, and the other sustains a corresponding injury, in consequence of the receivership. The earnings of the factory—the net profits now in the registry of the court—should be apportioned, so that the general creditors shall be compensated for the property not covered by the mortgage, which was used in making them. Such compensation being made, the remainder of such profits must be applied to meet the deficiency of the mortgage debt.—*Fosdick v. Schall, supra.*

The second of the trusts declared by the assignment executed by the corporation, is as follows; "To pay, as soon as, in the judgment of such trustees, it may be safely done, the sum of money borrowed by the company on the credit of the directors and others, not to exceed the principal of $7,500.00." It is conceded that the debt, for the payment of which this trust was created, was that paid by Clopton, Goldthwaite and Matthews; and it is by virtue of it that they now claim priority over other creditors, on the fund derived from other sources than the sales of the mortgage property. It is admitted the assignment is general, covering all the property of the corporation. All such assignments, under the statute (Code of 1876, § 2126), enure to the equal benefit of all creditors. All preferences created or attempted to be created by them are annulled—they are blotted out by the statute—while the validity of the assignment is preserved, and it stands as a common security for the benefit of all the creditors of the assignor.—*Holt v. Bancroft*, 30 Ala. 193; *Price v. Mazange*, 31 Ala. 701. That this preference can not be preserved and enforced against the objection of other creditors who have not assented to it, when expressed in any appropriate mode, is not doubted. One of the earliest orders made on the foreclosure bill, before the creditors were notified and called in, was, that the receivers should pay " the amount borrowed

by said company on the credit of the directors, as stated in the register's report, whenever, in their good judgment, such payments may be made without embarrassing the operations of the company." There was no payment made by the receivers under this order, and no action had upon it whatever. At the November term, 1878, the creditors of all classes having come in, and filed and proved their claims, and the same having been audited and allowed, the court was proceeding to settle and adjust their priorities, and to marshal and distribute the assets, when a motion was made for an order to the register, directing him to pay, from the money in court, the amount which the receivers had been directed to pay on this claim. The motion was disallowed. Some stress is placed by the argument of counsel on the order to the receivers. If the order was of any force, it was conditional, and the condition not having happened, it was without further effect. In no event, having been made when the creditors whose interests were affected by it were not before the court, having opportunity to resist it, could it embarrass the court in the final adjustment of the priorities and equities of the parties, and in the distribution of the assets according to such equities and priorities.

The principal argument, however, in support of the priority of the claimants, is, that no creditor has, by appropriate pleading, invoked the court to declare the assignment general, and annul the trust by which a preference was given the debt paid by the claimants; and that the chancellor could not, *ex mero motu*, decree that the preference was void, and the assignment should enure to the equal benefit of all creditors. The preference is certainly valid and operative as against the assignor, and on the trustees. Of it, no others than creditors affected by it, who are postponed and deferred in reaping and realizing the fruits of the assignment, can be heard to complain. The manner in which they can make, and the court can entertain complaint of it, depends on the nature and character of the proceeding in which their rights, and the rights of the preferred creditor, may be involved.

When the foreclosure bill, and the bill of the receivers, were consolidated, the objects and purposes of the suit were materially enlarged. It was converted into a suit having for its controlling purpose the administration of all the assets and property of the insolvent and suspended corporation. The creditors of all classes, secured and unsecured, were notified and called in to establish, not only their own claims, but to contest the claims, and any alleged liens or priorities of rival creditors. They were not made parties formally, by being introduced as such into either bill, nor by the service

of process upon them. When, however, they came in upon notice, filed their claims, and made proof of them, they submitted to the jurisdiction of the court, and became *quasi parties.* No formal intervention on their part, no cross-bill, or petition asserting their rights, or opposing the rights or claims of others, was necessary. Unless some independent relief was sought, which would not fall within that the court must necessarily award in marshalling and distributing the assets—relief which could not be obtained by proceedings before the register in ascertaining the priorities, or liens, or justice and extent of the several claims of the creditors, there can be no reason for compelling them to the introduction of cross-bills, or petitions, multiplying the expenses, and delaying the final termination of the litigation. It is a general rule of chancery practice, that a defendant, seeking affirmative relief, must file a cross-bill; or, if there are opposite interests between co-defendants, the determination of which is necessary to a complete final decree upon the subject-matter of the suit, a cross-bill must be filed; and the court will stay proceedings, and direct it to filed.—2 Dan. Ch. Pr. 1550 (last Ed.) These rules have but a narrow and limited application to suits for the marshalling and distribution of assets, when creditors, having conflicting claims, are not introduced as formal parties, but come in under the decree of the court, and submit to its jurisdiction, that their rights in the administration of the assets may be protected and enforced. The court must mould and adapt its practice and course of proceeding to the rights and equities of the parties; as they are plainly shown in the course of procedure they have been invited and compelled to adopt. Every general, and every secured creditor, was called before the court, because the court proposed and intended to inquire into, and, when ascertained, to protect and enforce his rights and equities, and to afford him the opportunity of confronting and contesting all rival and conflicting claims. The scope of the suit before the court was broad enough to open the door for the assertion of their rights, and for their controversies with all who claimed priority or equality. No fact or circumstance was shown, which hindered the court from proceeding to determine how far they were equal, or how far priorities existed. The whole matter was within the jurisdiction of the court, and a complete decree could not have been rendered, without determining it, in. all its length and breadth. The court was bound to determine—it could not abstain from determining, when it came to decree the payment of a particular debt, whether it should be paid in preference, or upon an equality with other debts; and if in preference, upon

which of the funds it had preference. The decree would have been incomplete—it would not have satisfied the purposes of the suit—it would not have measured out the relief promised when all creditors were called in to attend the administration of the assets—if it had not adjudged the respective equities and priorities of the creditors. No assent that such equities and priorities should be postponed, no waiver of legal or equitable rights, is shown or intimated. Each creditor stood before the court with these, as defined and declared by the law, submitted for determination, as if each, in some independent suit, having only their rivals before the court, had averred them, and they had been litigated, and the facts were as shown from the evidence given in support of them on the proceedings before the register.

It is said, however, the assignment declares and recites that the creditors assented to it. It is declared primarily, that the stockholders, in convention assembled, had resolved, that it was expedient to secure the payment of all corporate debts, that all corporate property should be transferred to trustees. This declaration, doubtless, proceeded from abundant caution, to avoid any impeachment of the assignment, because made otherwise than with the concurrence of the stockholders. The succeeding recital is, that the stockholders, in convention, had resolved that the conveyance, as it is termed, should be made by the president of the corporation, and that the creditors and stockholders had selected certain trustees, and that the creditors had *assented to the terms herein stated*. There is not a word here written, which indicates the presence of any creditor, who was not a stockholder, or that any other had the opportunity of assenting to, or dissenting from the preference claimed by the appellants. Such generalities can not obscure or embarrass well-defined legal rights, unless by evidence they are applied to particular creditors. The assignment on its face, and in its legal operation, is no more than the act of the assignor; by no declaration or recital in it, can he conclude others, who do not give assent to them. The mere declaration he may make in it, can by no contrivance be converted into evidence against those who do not join in, or assent to it; nor can it cast on those who are to be injuriously affected by it the burden of averring or proving its untruth. It is no more than a mere narrative by the assignor, which affects him only. If others assent to its truth, and claim benefits from it, the burden of allegation and proof rests upon them, and they can not shift it to others, who stand upon their fixed legal rights and equities.

The claim of Stone & Clopton is for services as solicitors

of the corporation, rendered in the course of the present litigation. The burden of the service was, in the contest of claims, preferred against the corporation.· The courts of this State have long recognized, and summarily enforced, the lien of attorneys and solicitors for fees, or, rather, reasonable compensation for services rendered by them in obtaining judgments or decrees for their clients, or for bringing a fund into court, which the court has power to control. The jurisdiction of the court depends upon the lien, and that necessarily implies the existence of a subject to which the lien attaches, as between counsel and client.—*Guinn v. Nelson*, 1 Turn. Ch. 614; *Hunt v. McClanahan*, 1 Heisk. (Tenn.) 503; *Stewart v. Flowers*, 44 Miss. 513. It is enough, in the present case, to say there was no judgment or decree obtained by the solicitors, and no fund brought into the court by them, to which a lien attached; and the court had not jurisdiction to create and enforce for them a priority over other general creditors.

The decree of the chancellor in the first case must be reversed, and the cause remanded for further proceedings in conformity to this opinion; and in the other cases, must be affirmed.

STONE, J., not sitting.